THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FOREST DUNCAN, Plaintiff in Error.

*Opinion filed December 17, 1913—Rehearing denied Feb. 6, 1914.*

1. CRIMINAL LAW—*when court will not inquire into evidence heard by grand jury.* The court will not inquire into the proceedings before the grand jury in order to determine whether the evidence heard by that body was sufficient to support the indictment, unless all the witnesses were incompetent or all the testimony upon which the indictment was found was incompetent.

2. SAME—*effect where prosecuting witness does not testify before the grand jury.* The name of the prosecuting witness may be indorsed on an indictment for rape though she did not testify before the grand jury, and the fact that she did not testify before the grand jury does not raise the presumption that there was no competent evidence given which would warrant the grand jury in returning the indictment.

3. SAME—*fact that accused has not had opportunity to interview prosecutrix is not ground for a continuance.* The fact that neither the accused nor his counsel have had an opportunity to interview the prosecuting witness in a rape case is not ground for a continuance, nor can the court be required to enter an order requiring her to be produced in court for the purpose of granting such interview, where the name of the prosecuting witness was indorsed on the indictment so that the accused had notice that she would testify against him.

4. SAME—*what objection should be raised by challenge to the array.* An objection that the sheriff was guilty of misconduct in serving a special venire, in that he refused to serve the venire upon men who he ascertained by open questions were not married, must be raised by a challenge to the array, as the irregularity, if any, existed at the time the jurors were summoned.

5. SAME—*what testimony is admissible in rape case as showing means used by accused to obtain consent and silence.* In a prosecution for rape without force, testimony by the prosecutrix that when she told the accused she was afraid he replied that his first wife was only thirteen years old when he married her, and that during the act of intercourse he told the prosecutrix not to tell but to be wise and keep quiet, as another girl (naming her) had done, is admissible for the purpose of showing the means used by the accused to obtain the consent and silence of the prosecutrix.

6. SAME—*when prosecution is not required to make election as to offenses until proof is in.* In a prosecution for rape, where the

prosecutrix is under the age of consent, testimony of more than one act of intercourse with her permission is admissible, and the prosecution does not, by introducing evidence of the first act, waive its right to elect to prosecute upon the second one and is not required to make the election until after the proof is in.

7. SAME—*fact that the accused attempted suicide while in jail may be shown.* In a prosecution for rape, the fact that accused, while confined in jail after his arrest, attempted to commit suicide is a circumstance which may be proven and be taken into consideration by the jury in connection with the other facts and circumstances proven.

8. SAME—*when refusal to admit testimony as to contents of a memorandum book cannot be reviewed.* The refusal of the trial court, after permitting the accused to explain his motive in attempting suicide, to allow him to state what he had previously written in a memorandum book which was taken from him by the sheriff and not produced on the trial though demanded, cannot be reviewed on writ of error, where there is nothing in the record to show what the memorandum contained.

9. SAME—*the wife cannot testify for or against husband in a prosecution for rape.* The wife of the accused cannot testify for or against him in a prosecution for rape, and is not a competent witness to contradict the testimony of the prosecutrix in reference to conversations had with the wife in the presence of the accused or conversations which she testified she had overheard between the accused and his wife.

10. SAME—*when improper cross-examination of a witness for accused will not reverse.* Improper cross-examination of a witness for the accused, the only purpose of which was to show that she was a lewd and immoral woman and to degrade her before the jury, will not be ground for reversal, where the matters to which she testified in favor of the accused were of minor importance.

11. SAME—*when highly improper conduct by State's attorney will not reverse.* If the matters testified to by a witness for the accused are of minor importance, the fact that the State's attorney, as the witness was leaving the stand, stated, in the presence of the jury, that he desired to swear out a warrant for her arrest on the charge of perjury, to which the court responded, "Motion denied," is not ground for reversal of the judgment although such conduct is highly improper.

12. SAME—*when failure of bailiff to keep jurors from talking with outsiders will not reverse.* It is improper for the bailiff in charge of the jury in a criminal case to permit the jurors to be in the company of outsiders or to allow a juror to hold a conversation with his wife, but his action in so doing will not be ground

for reversal unless it is shown that the jurors, by such exposure, were influenced in some way to the prejudice of the accused.

13. SAME—*when fact of birth of a child is corroborative evidence in a rape case.* It is proper, in a prosecution for rape, to refuse an instruction that the fact of the birth of a child to the prosecutrix was no evidence that the accused was guilty, where the birth of the child occurred within the natural period of gestation reckoned from the act of intercourse with the accused testified to by the prosecutrix. (*Kevern v. People*, 224 Ill. 170, distinguished.)

14. SAME—*when refusal of an instruction as to character of charge of rape will not reverse.* Refusal to give an instruction to the effect that the charge of rape is easy to make, difficult to prove and more difficult to disprove, etc., is not ground for reversal even though it might not be error to give it, as the statement is more in the nature of an argument than a proposition of law.

15. SAME—*when instruction as to sufficiency of circumstantial evidence is not prejudicial.* An instruction given at the request of the People, stating that the jury are not required to be satisfied, beyond a reasonable doubt, of each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if, taking the testimony all together, they are satisfied, beyond a reasonable doubt, of the guilt of the accused, is not prejudicial, even though, under the facts of the case, the simile of a chain and its links is not applicable.

16. SAME—*what must be shown before accused can complain of a prepared form of verdict.* Where the jury are fully instructed as to the three forms of verdict which might be returned, the accused is not entitled to complain that the court gave the jury a prepared form of verdict which could be used under one, only, of such instructions, unless it is affirmatively shown that the judge failed to deliver prepared forms of verdict which could be used under the other instructions.

17. SAME—*when improper argument by State's attorney will not reverse.* Improper argument by the State's attorney in addressing the jury will not be ground for reversal, where the proof of the guilt of the accused is so clear and convincing that the jury could not have arrived at any other verdict than the one returned.

WRIT OF ERROR to the Circuit Court of DeKalb county; the Hon. CLINTON F. IRWIN, Judge, presiding.

JAMES W. CLIFFE, and H. S. EARLEY, for plaintiff in error.

P. J. LUCEY, Attorney General, LOWELL B. SMITH, State's Attorney, and C. H. LINSCOTT, (W. C. KELLUM, of counsel,) for the People.

Mr. CHIEF JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error, Forest Duncan, was convicted in the circuit court of DeKalb county of the crime of rape and sentenced to confinement in the penitentiary for a period of fifteen years. The indictment charged him with having committed the offense upon Eva Hamel, a child under the age of consent.

Forest Duncan and his wife, Annette, resided in the city of Sycamore, in DeKalb county. Eva Hamel, the prosecuting witness, resided with them from some time in September, 1911, until November 4, 1912. On November 8, 1912, she was taken to a maternity home in the city of Chicago and did not return to DeKalb county until the trial of the cause.

Among the names of the witnesses indorsed on the indictment as having testified before the grand jury was that of Eva Hamel. A motion was made to quash the indictment upon the ground that it was not based upon competent and legal evidence. In support of this motion it was shown that Eva Hamel did not testify before the grand jury, and it is urged that there could therefore have been no competent evidence upon which the grand jury could return an indictment. It was proper to indorse her name on the indictment even though she did not testify before the grand jury, as the indictment would serve as notice that she would be called as a witness on the trial. No attempt was made to show what testimony was heard by the grand jury, and it is not claimed that any of the witnesses who testified were incompetent. The names of a number of persons other than Eva Hamel were indorsed upon the indictment as witnesses. The authorities are practically uni-

form that courts will not inquire into proceedings before the grand jury for the purpose of determining whether the evidence heard by that body was sufficient to support the indictment, unless all the witnesses were incompetent or all the testimony upon which the indictment was found was incompetent. (*People* v. *Bladek,* 259 Ill. 69.) It will not be presumed, merely because the prosecuting witness did not testify, that there was no competent evidence given which would warrant the grand jury in returning the indictment.

When the cause was about to be called for trial plaintiff in error filed his motion for a continuance. The ground of the motion was that the prosecuting witness, Eva Hamel, had been kept in concealment from a time prior to the finding of the indictment until the filing of the motion, and that neither plaintiff in error nor his counsel had had any opportunity to interview her or learn what facts she intended to testify to. The motion also asked for an order to be entered requiring her to be produced in court that counsel for plaintiff in error might have an opportunity to interview her. Plaintiff in error had been accorded all the rights to which he was entitled under the law when he was served with notice that Eva Hamel would be one of the witnesses called to testify, on behalf of the People, on the trial of the charge preferred against him. She was under no obligation to grant him an interview or to discuss with him what her testimony would be unless she chose to do so. The affidavit in support of the motion for continuance presented no valid grounds for its allowance and the motion was properly denied.

One of the grounds urged in support of the motion for a new trial was the alleged fact that the sheriff was guilty of misconduct in serving a special venire ordered by the court after the regular panel of jurors had been exhausted, the charge being that the sheriff openly inquired of citizens if they were married men, and upon receiving answers

in the negative refused to serve the venire upon them, and that he served only men who were married. We have held, where the question was first raised after verdict, that the defendant waived all right to question the manner in which the jurors had been drawn by his failure to challenge the array and by accepting the jury to try his case, as a challenge to the array is the only manner in which that question can be preserved for review. (*People* v. *Conners*, 246 Ill. 9.) The question here is similar. The defect, if any, existed at the time the jurors were summoned, and plaintiff in error should have raised the question by a challenge to the array. In any event, the affidavits in support of this portion of the motion for a new trial fall short of sustaining the charge.

Eva Hamel was born June 23, 1898. She went to live with plaintiff in error and his wife in the month of September, 1911, under an arrangement whereby she was to assist in the housework, attend school during the school year, attend Sabbath school and be given a course of lessons on the piano. Plaintiff in error was not at home during all of the time between the date Eva Hamel took up her residence in the family and the time the alleged offense was committed. It appears from the testimony that he spent a considerable portion of his time in the county jail. He had been confined there on a number of occasions for drunkenness and once for contempt for the violation of an injunction. He was released from jail the last time on the second day of April, 1912, having been confined since about the first of February of that year. The prosecutrix testified that he came to his home on the day he was released from the county jail and slept there that night; that the wife of plaintiff in error at that time was working in a laundry in Sycamore, where she went to work each morning at seven o'clock, returning home at noon for lunch, and then remained at the laundry until six o'clock in the evening; that on the morning following his return home, and

after Mrs. Duncan had gone to her work at the laundry, plaintiff in error, while still in bed, made an indecent proposal to her; that she went to the laundry from school that evening and on the way home with Mrs. Duncan informed her of the insulting remark plaintiff in error had made; that on the next day, when she came home from school in the evening, she found that plaintiff in error had washed the dishes for her; that she dusted the dining room and kitchen and went into the bed-room, made up the cot upon which she slept and started to make up the bed which had been occupied by Mr. and Mrs. Duncan, when plaintiff in error came into the room, pushed her down on the bed several times and asked her to permit him to have intercourse with her; that she told him she was afraid, and he assured her it would not hurt her, and then pulled up her clothes and had intercourse with her; that while they were indulging in the act he told her to be quiet as somebody might hear if she made any noise, and that if she told anybody about it and it was found out she would be sent to the Geneva home for bad girls; that after plaintiff in error had left the room she discovered blood on her clothes; that Mrs. Duncan returned home at six o'clock but prosecutrix said nothing to her about what had happened; that as a result of this act she became so sore she could hardly walk.    She further testified that plaintiff in error had intercourse with her again on May 7, 1912.    Mrs. Duncan was still working at the laundry, and prosecutrix testifies that that morning, before she went to school, plaintiff in error told her if she would allow him to have intercourse with her he would wash the dishes for her, but she refused and he went away angry; that when she came home from school that afternoon, at four o'clock, he was there fixing the fire for the evening meal; that he had again washed the dishes for her, and after sweeping the dining room and kitchen she went to the piano to practice her music; that plaintiff in error came in and stood by the piano and solic-

ited her again to permit him to have intercourse with her, and she told him she was afraid; that he said it would not hurt her after the first time and she need not be scared; that he took her by the hand, led her into the bed-room and sat down on the bed, where he promised her if she would consent to the act he would buy her a pair of brown slippers; that she told him she was afraid because she was too young, and that he said she need not be afraid, as his first wife was only thirteen years old when he married her and was but fourteen when the baby was born; that they again indulged in the complete act of intercourse, and while the act was being accomplished plaintiff in error told her not to tell—to be wise like Gussie Enford, as she never told. The prosecutrix was then permitted to testify, without objection, that Gussie Enford was a girl who had worked for the Duncans. These are the only two acts that are testified to. She testified further that she was due to have her monthly sickness about the 28th of May, and when she failed to become sick she told Mrs. Duncan about it one Sunday, and during that day, while Mrs. Duncan was out in the yard, plaintiff in error came into the house and told prosecutrix to take some turpentine, which she did; that during the summer plaintiff in error wanted her to go to DeKalb and procure a doctor to produce an abortion and promised if she would go he would pay the expenses; that he told her if she would not go they would take her away; that when plaintiff in error would come home from work at night he and his wife would talk about taking prosecutrix to Chicago, and then, when the baby was born, sending it to plaintiff in error's mother, who resided in Columbus, Ohio, or giving it away; that on Sunday, November 3, 1912, she walked about half a mile up the track of the Chicago Great Western railway with the plaintiff in error and his wife, where the advisability of going to Columbus was discussed; that she said she didn't want to go, and plaintiff in error told her it was for her own good, and that she

should pack up her things and leave on Wednesday morning, November 6; that he would not go but his wife would go with her and he would stay and prepare the goods for shipment to Columbus; that in this conversation he stated they would live in Columbus until after the baby was born, when they would give it to his mother and then come back to Sycamore and nobody would ever know anything about it; that the next day, November 4, Joseph Ogden, the chief of police of Sycamore, came to the Duncan home and took her across the street to Mrs. Mitchell, the wife of a member of the police force, where she was interrogated as to her condition; that at that time plaintiff in error was working in the country, near Sycamore; that he came home that evening about six o'clock, when Mrs. Duncan told him that Ogden had been there; that he asked both his wife and the prosecutrix whether either of them had told Ogden what was the matter, and upon receiving negative responses he told his wife to get ready and take the witness immediately to the city of DeKalb and that they would go to Chicago from there; that Mrs. Duncan, without waiting for the evening meal, took the clothes, which had been washed that day, from the line and in company with prosecutrix went to the outskirts of the city of Sycamore, where they took an interurban car for the city of DeKalb; that on arriving at DeKalb they went to the home of a brother of Mrs. Duncan; that Mrs. Duncan returned to Sycamore during the evening, and about half-past ten o'clock that night plaintiff in error came to the house of his brother-in-law, entered the bed-room of the prosecutrix and told her not to be afraid, as they would both be over in the morning; that about three o'clock the following morning Ogden and Mitchell came in an automobile and took her back to Sycamore; that they went to the police station and remained in the office there until about half-past seven o'clock; that after she arrived at the police station she heard plaintiff in error talking there in a cell near the office; that he

was crying and saying he did not do anything to the kid
and they needn't blame him for it. She testified further
that on the 8th day of November she was taken to a ma-
ternity home in the city of Chicago, and on the 13th day
of February, 1913, while there, gave birth to a child.

The other evidence on the part of the People tends to
prove that while the prosecutrix resided in the home of
plaintiff in error she was never seen in the company of,
and was never known to receive the attention of, any man
or boy; that when she was not attending school or Sabbath
school or engaged in her duties about the Duncan home she
was never seen in the company of anyone except the Dun-
cans; that plaintiff in error had ample opportunity to com-
mit the act complained of; that his wife, at the time both
acts of sexual intercourse are alleged to have occurred, was
working at the steam laundry from seven o'clock in the
morning until six in the evening of every day except Sat-
urday and Sunday and excepting the noon hour; that the
plaintiff in error for some days after his release from the
county jail on April 2 was not engaged in any work and
was about the house at times when he and the prosecutrix
were alone; that he returned home from his work at half-
past five o'clock on the evening of November 4, 1912, and
later that evening went to the city of DeKalb, arriving
there about half-past ten o'clock, and returned to the city
of Sycamore on the car leaving DeKalb at eleven o'clock;
that when he returned to Sycamore he was intoxicated and
was arrested and placed in the police station because of his
drunken condition; that earlier that evening he had gone to
the home of Mrs. Whitney, a sister of his wife, and asked
her if she knew where Mrs. Duncan and Eva were, stating
that they were not at home; that at that time he informed
Mrs. Whitney that he was about to send some ducks he
had, to his mother, at Columbus, Ohio; that afterwards,
when he had been released on bond pending the action of
the grand jury, he informed Mrs. Whitney that when he

asked her about his wife and Eva on the evening of November 4 he knew they were in DeKalb at the home of his wife's brother, and that he had agreed to go there on the 7:30 car but had got hold of some whisky and did not go; that when he was taken in custody the night of November 4 he was informed it was because of his drunken condition, and although he had not then been charged by anyone with the crime of rape, while confined in the police station he kept repeating that he had done nothing to the kid and that they couldn't blame him for it; that the following morning, when Ogden told him Eva had charged him, with being responsible for her condition, he said, "Well, if the kid says so I will have to take my medicine;" that while he was confined in the jail, and prior to his release on bond, he attempted to commit suicide. Other incidents having a slight tendency to corroborate the testimony of the prosecutrix were also shown.

Six witnesses testified that the general reputation of Eva Hamel in that community for truth and veracity was bad and that they would not believe her under oath. Five witnesses testified to her good reputation for truth and veracity. The defense attempted to impeach Eva Hamel in other particulars, and to show that on different occasions she had made statements contradictory to her testimony in court. On her cross-examination she was asked if she did not state to Mrs. Duncan, after she had told her of her condition, that a certain young man (naming him) was the cause of it. She answered that she did, and then testified that she had not charged this young man with being responsible for her condition, but that Mrs. Duncan kept asking her if this one or that one was responsible, and when she asked her if it was this person she told her it was, because she did not want her to ask anything more about it. When the prosecutrix was brought back from DeKalb early in the morning of November 5 she was interrogated by Ogden, Mitchell and J. D. Beckler, the mayor,

in the office at the police station. It was through the efforts of Beckler that she had been placed in the home of the Duncans and he had always taken a kindly interest in her welfare. In response to the questions of these men as to who was responsible for her condition, she replied that it was a fellow by the name of Bill, whom she had met in front of a restaurant in Sycamore and with whom she had gone down along the railroad track. She admitted having made these statements, and gave as a reason that while she was sitting in the office of the police station she recognized the voice of plaintiff in error, who was then confined in a near by cell, and it was because of her fear of him that she made these statements. These statements comprise the only proof tending to show that Eva Hamel was ever in the company of any man or boy other that plaintiff in error. Officer Mitchell testified that he was in the police station practically all the time the prosecutrix was there on the morning of November 5 and that he did not hear any sound or exclamation by plaintiff in error and that anything that he might have said could not have been heard in the office. Prosecutrix is corroborated in her testimony in this respect by Ogden, who testified that he heard the plaintiff in error crying as they sat in the front office and heard him use the same language testified to by her. She is contradicted in some respects by Mrs. Mitchell, who testified that when she examined the girl she denied to her that she was pregnant, and also told her that plaintiff in error had never done her any wrong but had always acted like a gentleman. The girl admits that she denied her pregnancy to Mrs. Mitchell, but she denies that anything was said in reference to plaintiff in error or his treatment of her. Lillian Snyder, a witness for the defense, testified that during the month of May, 1912, the prosecutrix was at her residence, which was near the Duncan home, selling horseradish; that she told her on that occasion she had taken turpentine and that it made her

sick; that when she asked her why she had taken that, she said she had been told that that would keep people from having babies. She also testified that on this occasion the prosecutrix told her she must hurry home, as she had been down the railroad track with a boy and Mrs. Duncan would scold her if she was late. The prosecutrix testifies that this conversation never occurred and that she had never been at Mrs. Snyder's home. Another witness testified that during that summer she saw prosecutrix in the yard at the Snyder home.

Plaintiff in error denies that he ever had intercourse with prosecutrix or that he ever attempted to take any liberties with her person. He denies the testimony of prosecutrix in reference to the offer to have an abortion performed and to the proposed visit to Chicago or Columbus, but he makes no explanation of the removal of the prosecutrix to DeKalb on the night of November 4 or of his visit to her at the home of his brother-in-law that night. He denies the statements attributed to him by prosecutrix and Ogden in the police station at Sycamore. On the other hand, he testifies that when Ogden informed him that the girl had accused him he denied his guilt. He admits that he attempted to take his life while confined in the jail and that he intended to kill himself, and gave as a reason that he had been confined in the jail for several days; that neither his wife nor any of his friends had come to see him; that he had been unable to see an attorney, and that he became despondent and discouraged.

It is complained that the court erred in permitting testimony as to the conduct of plaintiff in error with other girls of tender years. The basis for this contention is the testimony of prosecutrix as to what he said to her while they were indulging in the act of intercourse on May 7. This testimony was not admitted for the purpose of showing that plaintiff in error had been guilty of any crime or impropriety with any other woman. It was admissible as

a part of the *res gestæ* to show the means he had used to procure the consent of the prosecutrix to the act and to insure her silence thereafter. It does not appear from this testimony what the age of Gussie Enford was or that plaintiff in error had ever had intercourse with his first wife before they were married. It is immaterial for the purposes of this case whether plaintiff in error stated the truth to the prosecutrix in reference to Gussie Enford or his first wife. This testimony was only material to show the means used by plaintiff in error both to bring about the consent of the prosecutrix to the act and to procure her silence.

At the close of all the testimony the defense moved that the People be required to elect as to which act of intercourse would be relied upon for conviction. The State's attorney elected to rely upon the act of May 7. It is now contended that having first offered evidence as to the commission of the act of April 4, that constituted an election on the part of the People and that proof of the crime charged should have been confined to that act. Plaintiff in error was not charged with having committed a forcible rape. The prosecutrix admits that in each instance she consented to the act. If the act was committed as testified to by her it constitutes rape only because of her age. Under these circumstances more than one act of intercourse with the complaining witness may be proved,—not for the purpose of proving distinct offenses, but for showing the relations existing between the parties and for corroborating the testimony of the complaining witness as to the particular act relied on for conviction. (*People* v. *Gray*, 251 Ill. 431.) The prosecution was not required to elect as to which act it would rely upon for a conviction until after the proof was in.

The admission of the proof of the attempt of plaintiff in error to take his life while confined in the county jail is assigned for error. It has been universally held that the escape from custody or flight of one accused of crime may

be proven upon the trial as a fact raising a presumption of guilt. It is insisted that an attempt at suicide is not analogous to flight or escape from custody, for the reason that in fleeing the accused is attempting to escape punishment entirely, whereas in attempting suicide he is endeavoring to inflict. upon himself the highest punishment known to the law; and it is also pointed out as a matter of common knowledge that many people commit suicide who are charged with no offense and who do so for various and sometimes trivial reasons. While it may be true that one entirely .innocent of the charge might under like circumstances attempt to flee, escape from custody or take his life, it is not the action that would be expected of an innocent man, and such acts could in no sense be interpreted as indicating innocence. On the other hand, it is undoubtedly true that one guilty of the charge might prefer to avoid the humiliation and disgrace of a conviction and escape the punishment imposed by law by taking his life, just as he might seek to accomplish the same result by flight or escape from custody. The fact that defendant attempted to commit suicide was a circumstance which was proper to be taken into consideration by the jury in connection with all the other facts and circumstances proven.

Plaintiff in error testified in his own behalf that he had attempted to take his life while confined in the jail, and was permitted to explain his motive and the reasons which prompted him to .do so. While testifying on this subject he stated that before attempting to take his life he had made a statement in a bank book which he had in his pocket, and that the sheriff had taken this book away from him after he had stabbed himself. A demand was made for the production of the book but it was not produced, and plaintiff in error testified that he had not seen the book since and did not then have it in his possession. He was asked what he had written in this book, and to this question .an objection was sustained. This was followed by a

261 – 23

series of questions as to what the writing consisted of. To all these questions objections were sustained, and this ac- tion of the court is complained of as error. No offer was made to prove what this memorandum contained. Without the contents of the memorandum before us there is nothing for us to review, as in its absence we have no means of determining whether the rulings of the court were correct.

The defense called the wife of plaintiff in error as a witness and the court refused to allow her to testify on any subject. It is insisted that she is a competent witness to contradict the testimony of prosecutrix in reference to conversations had with Mrs. Duncan in the presence of the plaintiff in error and the conversations which the prosecutrix testified she had overheard between Mrs. Duncan and her husband. At common law a wife could not be a witness for or against her husband as to any matter, and this rule of the common law has not been modified by statute so as to permit a wife to testify either for or against her husband in a case of this kind.

It is complained that the court erred in the latitude allowed the State's attorney in the cross-examination of Mrs. Snyder, whose testimony is set out above. The State's attorney was permitted, over the objection of the plaintiff in error, to interrogate her as to her relations with her husband before they were married and to elicit the fact that she had a child by him before marriage. She was then questioned minutely as to the conduct of her home and as to occurrences there, for the evident purpose of showing that she was a woman of questionable character and loose morals and that she was engaged in running a disreputable house. She denied all insinuations as to her misconduct, but the defendant insists that it was error to permit this examination. The cross-examination was improper and the objections of plaintiff in error should have been sustained. The only purpose of the cross-examination was to cast reflections upon the chastity of the witness and thus degrade

and disgrace her in the eyes of the jury. This was not the proper method to impeach the witness. Some of the questions called for an admission or a denial of matters that were extremely lewd and vulgar, and had the witness testified to any very material fact in controversy it would be a grave question whether the sanction of the court to this cross-examination would not constitute reversible error, even though the witness denied each charge and insinuation involved in the questions propounded by the State's attorney. The matters testified to by this witness were of minor importance, and although by his cross-examination the State's attorney may have succeeded in discrediting her in the eyes of the jury, we do not think this so prejudicial as to warrant a reversal of the case.

When this witness was about to leave the stand the State's attorney stated in the presence of the jury, "I desire to swear out a complaint and have Lillian Snyder arrested on a charge of perjury," to which the court replied, "Motion denied," and it is insisted that this was prejudicial. This action of the State's attorney was inexcusable. If he felt that the witness should be prosecuted for perjury he should have gone about procuring her arrest in an orderly manner. It was not necessary for him to make this statement in the presence of the jury. Mrs. Snyder was a resident of Sycamore, and if the State's attorney desired to procure her arrest and to prosecute her on any charge she could have been easily found. For the reasons just given in connection with the complaint made as to the cross-examination of this witness we do not believe that this was so prejudicial as to warrant a reversal.

One bailiff was sworn to attend the jury during the trial, but it appears that on some occasions when the jury were taken to and from their meals the sheriff accompanied them together with the bailiff, and on one or two occasions he remained with them and the bailiff on the court house lawn during intermissions. On these occasions it does not

appear that any word was spoken between the sheriff and any member of the jury. On one occasion, while the jury were outside the court house, the wives of two of the members asked permission to speak to their husbands. This was denied them, whereupon one handed her husband a small sum of money and the other handed her husband some clean linen. The woman who handed her husband the money said nothing. The other woman conversed with her husband for a moment or two in the presence of the bailiff. It is not claimed that plaintiff in error was prejudiced in any way, except by the mere fact that the sheriff accompanied the jury and the fact that the wives of two of the jurymen were permitted to see their husbands under the conditions stated. It was the duty of the officer in charge to keep the jury at all times entirely removed from the company of others. It was indiscreet at any time to permit them to be in company with others, but unless it is clearly shown that they were by this exposure operated on in some way to the prejudice of plaintiff in error the verdict should not be set aside for that cause alone. *Adams* v. *People,* 47 Ill. 376.

Plaintiff in error complains of the action of the court in refusing to give two instructions, each of which, in substance, stated that the fact of the birth of the child on February 13, 1913, was no evidence that plaintiff in error was guilty of the crime of rape. The prosecutrix testified that after the first act of intercourse she had her regular monthly sickness in the latter part of April; that the last act of intercourse was on May 7, after which her menses ceased, and that on February 13 (282 days thereafter) she gave birth to a child. The birth of the child occurred within the regular period of gestation as testified to by witnesses on behalf of the People, and as it corroborated the testimony of prosecutrix that plaintiff in error had intercourse with her on May 7, it was competent to prove the fact as a corroborative circumstance. By these instruc-

tions the jury would have been told that the fact of the birth of the child was no evidence whatever in the case, and they were properly refused. Plaintiff in error relies upon *Kevern* v. *People,* 224 Ill. 170, in support of his position that these instructions should have been given. In that case it was not claimed that the birth of the child resulted from the act of intercourse there complained of, but the prosecutrix testified that at the time Kevern was charged with having committed the rape upon her she was then with child, and had been in that condition for three months. What was said in the *Kevern case* in reference to the effect of the birth of a child has no application to the state of facts disclosed here.

Complaint is also made of the refusal of the court to give an instruction that the charge of rape is easy to make, difficult to prove and more difficult to disprove, and that it is the duty of the jury to carefully and deliberately consider, compare and weigh all the testimony, etc., and if from all the facts and circumstances they have a reasonable doubt as to the truth of the charge, it is their duty to find the defendant not guilty. This instruction has frequently been given in many jurisdictions, but we know of no case that has ever been reversed because of the refusal to give it. That the charge of rape against a person is easy to make, difficult to prove and more difficult to disprove is not a proposition of law, but it is more properly an argument which might legitimately be made to the jury. The court did not err in refusing this instruction.

At the request of the People the court gave several instructions as to what is meant by circumstantial evidence in criminal cases. The giving of these instructions is complained of, upon the ground that proof of the crime rests alone upon the unsupported and uncorroborated testimony of Eva Hamel, and that there were no circumstances proven which would permit of the giving of such instructions. Aside from the direct testimony of the prosecutrix

to the commission of the act there were many corroborating circumstances proven which tended to show the guilt of plaintiff in error. The attempt to spirit the girl away; the statements testified to as having been made by plaintiff in error in the police station; his attempt at suicide in the jail; the birth of the child within 282 days after the alleged act of intercourse; the fact that the complaining witness had never been seen in the company of other men and boys, and that plaintiff in error had ample opportunity to have committed the act complained of, are all circumstances which tend to corroborate the testimony of the prosecutrix and to establish the fact that the crime had been committed by plaintiff in error. Under the state of the proof in this case these instructions were properly given.

At the request of the People the court instructed the jury that testimony had been introduced to impeach certain witnesses, and testimony had also been introduced tending to sustain their reputation for truth and veracity "and their general moral character," and concluded by instructing them that they were to consider such testimony as bearing upon the credibility of such witnesses. As the reputation of the prosecutrix was the only one thus assailed and as it was only questioned in respect to truth and veracity, it is complained that it was error to give an instruction stating that testimony had been introduced tending to sustain her general moral character. This expression had no proper place in the instruction, and, no doubt, was inadvertently inserted. We are unable to perceive, however, wherein it was harmful. The moral character of the prosecutrix was not and could not have been put in issue, and the jury could not have been misled by this expression.

The jury were further instructed on behalf of the People, in substance, that they were not required to be satisfied, beyond a reasonable doubt, of each link in the chain of circumstances relied upon to establish guilt, but it was sufficient if, taking the testimony all together, they were

satisfied, beyond a reasonable doubt, of the guilt of plaintiff in error. This instruction has been expressly approved in *Siebert* v. *People,* 143 Ill. 571, where conviction was had upon circumstantial evidence, alone. Under the facts shown in this case the simile of a chain and its links is not applicable, but as applied to the evidence this instruction could only be understood as stating that if from the whole evidence the jury had no reasonable doubt of guilt they should convict although they might entertain such doubt as to some particular circumstance, which is the correct rule. (*Weaver* v. *People,* 132 Ill. 536; *Carlton* v. *People,* 150 id. 181; *Henry* v. *People,* 198 id. 162; *People* v. *Scarbak,* 245 id. 435.) While the instruction was technically erroneous it was not prejudicial to give it.

The jury were instructed as to the form of their verdict in case they should find the defendant guilty and fix his punishment at imprisonment in the penitentiary for life, the form in case they should find him guilty and fix his punishment at imprisonment in the penitentiary for a period of years, and the form in case they should find him not guilty. The indictment contained two counts charging an assault with intent to commit rape, but no instruction was given as to the form of the verdict in case the jury should find plaintiff in error guilty under these two counts. No complaint is made of the correctness of the instructions as to the form of the verdict, except that it is contended that each of the two instructions in reference to a verdict of guilty begins, "The court instructs the jury," whereas the instruction in reference to the verdict of not guilty is, "If the jury find the defendant not guilty you will say by your verdict, 'We, the jury, find the defendant not guilty.'" It is complained that as the last of these instructions was different in its phraseology from the others it was not likely to receive the consideration it should. This contention is wholly without merit. The instructions were proper.

It is complained that an improper form of verdict was delivered to the jury. On the motion for a new trial the clerk of the court testified that the verdict returned was on a blank form such as is kept in his office; that prior to the delivery of this form of verdict to the jury the trial judge filled in the necessary blanks, and that after the printed words in the form, "We, the jury, find the defendant guilty of," he wrote in the word "rape," which is followed by the printed words, "as charged in the indictment." It is not shown what other forms of verdict, if any, were prepared and handed to the jury. It is contended that the trial judge, by writing in the word "rape" in the blank form of verdict, withdrew from the consideration of the jury the charge made against plaintiff in error in two counts of the indictment of an assault with the intent to commit rape, and this contention is no doubt made on the assumption that no blank form of verdict was prepared and given to the jury to be returned in case they found plaintiff in error guilty of assault with intent. There is no merit in this contention. The court, on behalf of plaintiff in error, instructed the jury that if "there remains in the minds of the jurors a reasonable doubt as to whether or not the defendant, Forest Duncan, had intercourse with the complaining witness, Eva Hamel, on May 7, 1912, as alleged in the indictment, then it is the duty of the jury, under the law, to find the defendant not guilty." By this instruction, given at the request of plaintiff in error, the court withdrew from the consideration of the jury the charge of assault with intent to commit rape. This instruction was properly given, as under the evidence the plaintiff in error, if guilty of any crime, was guilty of rape alone, and he had the right to have the case submitted to the jury on that theory. It will not be presumed, as counsel seem to assume in their argument, that this was the only form of verdict delivered to the jury. The jury were fully instructed as to the three forms of verdict which might be returned, and if the court,

having handed to the jury a prepared form of verdict which could have been used under but one of the instructions, failed to also deliver to the jury prepared forms of verdict which could have been used under the other two instructions, that fact must affirmatively appear before plaintiff in error can be heard to complain that he has been prejudiced in that particular.

In his closing argument to the jury the State's attorney treated the testimony of Eva Hamel as to what plaintiff in error said to her at the time he had intercourse with her on May 7 as proof of acts of intercourse with other girls. The court sustained an objection to the statement that the ungovernable lust of plaintiff in error for women had been the one thing in his life which had brought him to where he was, remarking, "There is nothing like that in the record." He was then permitted, over objection, to make an inflammatory argument, to the effect that plaintiff in error had been guilty of improper conduct with two other little girls. It was clearly wrong to permit an argument of this character. The proof of what plaintiff in error said to Eva Hamel at the time the act of May 7 was committed was not for the purpose of showing that he had been intimate with other girls, but was for the sole purpose of showing the arts he practiced upon the girl at that time as a part of the *res gestæ*. It was improper for the State's attorney to attempt to make any other use of this testimony. If the proof in this case left any reasonable doubt as to the guilt of plaintiff in error we would not hesitate to reverse this judgment because of this action of the State's attorney. The proof of his guilt is so clear and convincing, however, that we are of the opinion that the jury could not have arrived at any other verdict, and the judgment will not be disturbed because of the errors which have intervened.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*