(No. 57068.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ENICE LYLES, JR., Appellant.

*Opinion filed April 19, 1985.—Modified on denial of rehearing May 31, 1985.*

Charles M. Schiedel, Deputy Defender, and Theodore A. Gottfried, State Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney and Joan S. Cherry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Enice Lyles, Jr., was charged in a three-count indictment in the circuit court of Cook County with the murders of Mary (Nichols) Thigpen and her two young sons, Robert and Roderick Nichols. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a).) A jury found the defendant guilty of the murders of Robert and Roderick Nichols and guilty of voluntary manslaughter in regard to the death of Mary Thigpen. Following a separate bifurcated sentencing hearing before the same jury, the defendant was sentenced to death. The sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). For the reasons set forth below, we affirm defendant's convictions

but reverse the sentence of death and remand the cause for a new sentencing hearing.

On February 25, 1978, at approximately 4 a.m., two Harvey police officers were flagged down by Warren Griffin. Griffin was upset and out of breath. He told the officers that he had just been to the home of his fiancee, Mary Thigpen, but had received no answer. He stated that he then peered through the bathroom window and observed one of Thigpen's sons lying face down in a bathtub partly filled with water. The officers drove Griffin to the Thigpen residence to investigate. They observed the body of the child in the bathtub through the bathroom window. The outer doors of the home were locked and showed no sign of forcible entry. After receiving no answer the police broke down a door and entered the residence.

Inside the police found the body of Roderick Nichols, age 5, lying face down in the hallway. The child's hands were bound behind his back and there was a cord wrapped around his neck. The body of Robert Nichols, age 4, was found in the bathtub. The child's hands and feet were bound and there was a ligature wrapped around his neck. The bathtub faucet was dripping, and the tub was three-fourths full as a towel had clogged the drain. Post-mortem examination showed the cause of death for both boys to have been ligature strangulation. The post-mortem examination also disclosed no indication of drowning in regards to Robert.

The body of the boy's mother, Mary Thigpen, was found propped up against the couch in the living room. She had stab wounds to her abdomen and arms and had a cloth ligature wrapped around her neck. The post-mortem examination showed the cause of death to have been ligature strangulation with stab wounds to the lung and abdomen. At the time of her death Mary Thigpen was six months pregnant.

After being informed that Mrs. Thigpen and the two boys were dead, Warren Griffin told the police that he thought that Enice Lyles had probably killed the family. Griffin stated that approximately two weeks before the killings he was present when Enice Lyles waved a screwdriver at Thigpen and threatened to kill her if she "kept up" whatever it was that was making him angry. Griffin further stated that Lyles had been in prison for murder and was recently released. He also told the police that Lyles lived in the basement of the house in front of the Thigpen residence and had babysat for Thigpen on several occasions.

The police proceeded to the house where Lyles lived. Lyles showed no emotion when told of the killings and stated that he had not seen Thigpen or her children for a few days. While talking with Lyles the police observed that he had three deep open lacerations on his right hand. The officers then asked Lyles if he would accompany them to the police station and he agreed.

Lyles arrived at the police station at approximately 6 a.m. and told the officers questionable and inconsistent stories about how he received the cuts on his hands and about his involvement in the killings. At approximately 10 a.m., Lyles confessed to the killings. Later that day a court reporter was summoned and Lyles gave a statement which was later transcribed and then signed by Lyles.

In the statement Lyles confessed to killing all three victims. Lyles stated that he had babysat for Mary Thigpen on Wednesday night, February 23. He stated that Thigpen became abusive when she arrived home and began threatening him with a knife. A struggle ensued, during which Lyles received the cuts on his hands. Lyles stated that he was able to force the knife away from Thigpen and began to stab her in the stomach with it. He then told of how he strangled Thigpen and her

two young sons to death. He also stated that he had purchased first-aid supplies from a local drugstore on Thursday, February 24, and dropped his clothes off at a cleaners because he had blood stains on them. When later asked why he had killed the two boys, Lyles stated because he was afraid they would tell on him for killing their mother.

Lyles' confession was read to the jury. The confession was corroborated by the testimony of the drugstore clerk and the cleaning clerk, who both remembered Lyles coming in with the cuts on his hands. It was also corroborated by the fact that, at the time of the confession, no one other than the murderer knew that Robert Nichols had been strangled to death and had not drowned. After hearing all the evidence the jury found Lyles guilty of the murders of Robert and Roderick Nichols and guilty of voluntary manslaughter in regards to the death of Mary Thigpen. A bifurcated death sentencing hearing was then held.

During the first stage of the hearing the State introduced evidence that Lyles was over the age of 18 at the time he committed the murders of Robert and Roderick Nichols. The jury was also instructed that it could consider the two boys murders in determining if Lyles was eligible for the death sentence. The State also introduced evidence that Lyles had pleaded guilty when he was 14 years old to the murder of a guard at a youth camp. The jury found Lyles eligible for the death penalty.

During the second stage of the sentencing hearing the defense, as a mitigating factor, attempted to establish that Lyles was suffering from a severe mental or emotional disturbance. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).) The defense introduced the testimony of psychologist Martin Scripp and psychiatrist Marvin Ziporyn in support of this argument. The State responded with the testimony of psychiatrist Gerson Kaplan. The

jury found that there were no mitigating factors suffic- ient to preclude the imposition of the death penalty and sentenced the defendant to death.

The defendant first contends that his conviction should be overturned because the trial court erred by not suppressing his confession and other evidence stemming from his alleged illegal arrest. The defendant filed a mo- tion to suppress the confession on the grounds that it was involuntary, obtained through coercion, and given without a knowing waiver of his *Miranda* rights. A hearing on the motion began on December 15, 1980, and the motion was subsequently denied.

On the morning the trial was to begin, May 24, 1982, the defendant filed another motion to suppress, this time alleging that the police lacked probable cause to arrest the defendant. Jury selection was set for 9:30 a.m., and the State received the motion at 10:30 a.m. When the case was called, the State asked the court for a short continuance to study and prepare to defend against the motion, noting the untimeliness of the motion and the fact that the case was 4½ years old. The matter was continued until later in the day. When the matter was re- called the State informed the court that it was ready to proceed to a hearing on the motion. Defense counsel stated, however, that he wished to stand on the testi- mony which was given at the voluntariness hearing held a year and a half before the trial date. The State did not stipulate to the use of the testimony given at the volun- tariness hearing. Defense counsel himself had previously stated that the theory at the voluntariness suppression hearing was "simply and solely *Miranda* voluntariness and that's all. Never any contention made that the sup- pression should follow on the violation of the illegality of the arrest."

The trial judge noted the lateness of the filing of the motion and the fact that it had been a year and a half

since the voluntariness suppression hearing and that "nothing new in the way of grounds" had been discovered since that time. The judge stated that if the motion were going to be heard "at all it would be heard with the trial." He then stated that the motion was "stricken" and "denied at this time."

During the trial the defense renewed its objection to testimony concerning any post-arrest admissions made by the defendant on the grounds that the arrest had been made without probable cause. A conference was then held outside the presence of the jury. The State again informed the court that it was prepared to proceed to a hearing, outside the presence of the jury, on the probable-cause motion. The judge indicated that he would be inclined to hold such a hearing after the jury was excused for the day. The defense, however, stated that it was not asking for a hearing and questioned whether the purpose in holding such a hearing would be "to give them [the State] a chance to correct the defects in their case?" At the end of the day the State, "in the spirit of making the record clear," invited defense counsel to go to hearing on his motion and stated that the prosecution had the arresting officer present to testify. Defense counsel stated, however, that "he preferred to proceed in the fashion previously stated." Given these facts, we believe that the issue of whether there was probable cause to arrest has been waived.

On a motion to suppress based on a lack of probable cause to arrest, the initial burden of going forward with the evidence is on the defendant. (*People v. Black* (1972), 52 Ill. 2d 544, 553-54; *People v. Ross* (1978), 60 Ill. App. 3d 857, 861; *People v. Turner* (1976), 35 Ill. App. 3d 550, 567.) The defendant also has the primary obligation of calling up his motion for hearing and disposition. (*People v. Jones* (1984), 104 Ill. 2d 268, 278-80; *People v. Terry* (1975), 61 Ill. 2d 593, 596.) The trial judge acted within

the scope of his discretion in deciding that any hearing on the probable-cause motion would be held in conjunction with the trial, outside the presence of the jurors. (See *People v. Hicks* (1970), 44 Ill. 2d 550, 553; *People v. Colon* (1973), 9 Ill. App. 3d 989, 996.) The defense made it clear during trial, however, that it was "not asking for a hearing" on its motion and complained that a hearing would only give the State "a chance to correct defects in their case." The defense, by failing to request a hearing on its motion, failed to carry its burden of going forward with the evidence and its initial burden of proof. By failing to litigate its motion in the trial court, the defense has waived the issue on appeal.

The defendant next contends that he was denied a fair trial because the State implied to the jury that he had a previous criminal record. During the State's redirect examination of Warren Griffin the following colloquy took place:

"Q. Did you also tell the police something else about Mr. Lyles at that time, something about his background?

A. Yes, sir.

[DEFENSE COUNSEL]: Object to that, if the Court please. It has absolutely no probative value whatsoever. Counsel knows that.

What purpose could it serve? I ask that it be stricken and the jury instructed to disregard it.

THE COURT: The last question, sustained.

[DEFENSE COUNSEL]: Move for a mistrial.

THE COURT: Motion for a mistrial denied.

[ASSISTANT STATE'S ATTORNEY]: Would the Court like me to bring out exactly what he said?

[DEFENSE COUNSEL]: Object to that again and move for a mistrial.

THE COURT: Denied."

The defense later renewed its motion for a mistrial based on the colloquy, stating that the purpose of the question was to elicit the fact that Griffin told the police

that Lyles had been in prison for murder and was recently released. The State, in response, explained that the purpose of the question was to elicit the fact that Griffin told the police that, a few months prior to the murders, Lyles had hit him in the head with a golf club. The golf-club incident had been referred to during cross-examination and during earlier redirect examination. Admittedly, the question was ambiguous. The mere mentioning of the word "background," however, without a more direct reference to specific criminal activity, does not imply that someone has a "criminal" background, and thus the question did not deprive the defendant of a fair trial. *People v. Guyton* (1972), 53 Ill. 2d 114, 118-19; *People v. Pittman* (1981), 100 Ill. App. 3d 838, 843.

Defendant claims he was denied a fair trial because of a number of prosecutorial remarks made during closing arguments. Defense counsel, during his closing remarks, suggested that defendant's confession may have been coerced. On rebuttal one of the prosecutors stated:

> "Mr. Freeman [defense counsel] talks about the proceedings the police went through after they arrested Mr. Lyles and after they took him to the station and holds this up to you [the waiver form signed by defendant] and he says, 'Look at them' He didn't fill out all the blanks. The police said what happened and what the police said is uncontradicted, unrebutted. No evidence that says it happened any other way than that."

Later, after alluding to other remarks by defense counsel concerning the circumstances surrounding the confession, the prosecutor said:

> "Why did he talk about it? To raise some confusion. Again there is no evidence to contradict what Coleman McCarthy said. No evidence to rebut it at all."

Defendant asserts that the prosecutor, by characterizing the evidence surrounding defendant's confession as uncontradicted and unrebutted, improperly commented on

his failure to testify.

The prosecution cannot directly (*People v. Burton* (1969), 44 Ill. 2d 53, 56-57), or indirectly (*People v. Wollenberg* (1967), 37 Ill. 2d 480, 488), comment on the defendant's failure to take the stand in his own defense. It is well settled, however, that the prosecution may describe the State's evidence as uncontradicted—even though the defendant is the only one who could have contradicted it—provided it was not " 'intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " (*People v. Hopkins* (1972), 52 Ill. 2d 1, 6; *People v. Mills* (1968), 40 Ill. 2d 4, 8.) In this case, viewed in the context in which they arose, the prosecutor's remarks were not intended or calculated to direct the jury's attention to defendant's failure to testify. Rather, they were a legitimate response to defense counsel's suggestion that defendant's confession may have been coerced. Where defense counsel provokes a response, defendant cannot complain that the State's reply denied him a fair trial. (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51; *People v. Vriner* (1978), 74 Ill. 2d 329, 344; *People v. Benedik* (1974), 56 Ill. 2d 306, 311.) For the same reason we find no merit in defendant's contention that he was prejudiced when the prosecutor said on rebuttal, "You have seen in this case classic examples of how an attorney represents the defendant and goes to any length to mis-state the law to try to confuse the jury and tell them things that are absolutely wrong in order to walk the man out of the courtroom." Although we have repeatedly stated that it is improper for a prosecutor to charge defense counsel with attempts to free the defendant by trickery (*e.g., People v. Berry* (1960), 18 Ill. 2d 453, 458; *People v. Freedman* (1954), 4 Ill. 2d 414, 422; *People v. Savage* (1934), 358 Ill. 518, 522), the prosecutor's remark complained of here was invited by defense

counsel's argument in which he misstated not only the State's burden of proof but the weight to be given defendant's confession.

Other prejudicial remarks, defendant alleges, occurred when the prosecutor portrayed defense counsel as defendant's "mouthpiece" and when he interjected his personal feelings about the case by telling the jury, "You might have looked over to our counsel table and noticed some outrage. Some lack of belief. Some question or puzzled looks on our faces ***." On another occasion the prosecutor objected to a portion of defense counsel's closing argument, calling it "a lie. A bald face lie." Defense counsel retaliated by calling the prosecutor a liar, whereupon the court ordered the attorneys to his chambers "Off the record."

Generally, a prosecutor may not express his personal opinion about the defendant's case (*People v. Vriner* (1978), 74 Ill. 2d 329, 344; *People v. Monroe* (1977), 66 Ill. 2d 317, 324), or make personal attacks against the defendant's attorney (*People v. Kirk* (1966), 36 Ill. 2d 292, 297). We do not believe, however, that the comments complained of here deprived the defendant of a fair trial. " 'Where it appears that improper remarks do not constitute a material factor in the conviction *** the verdict will not be disturbed.' " (*People v. Fields* (1974), 59 Ill. 2d 516, 522, quoting *People v. Berry* (1960), 18 Ill. 2d 453, 458.) Here the evidence of guilt was overwhelming so that no rational jury could have done anything but convict defendant. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 29-30; *People v. Fields* (1974), 59 Ill. 2d 516, 521-22; *People v. Berry* (1960), 18 Ill. 2d 453, 458.) Defendant does not challenge the sufficiency of the evidence, and indeed he admits in his brief that he committed the crimes. Moreover, the State had sought murder convictions for each of the killings. Yet, after requesting and receiving a clarification of the voluntary-manslaughter

instruction, the jury convicted defendant of the voluntary manslaughter of Mary Thigpen. Thus, it is clear that the jury thoroughly considered the evidence and that its verdicts were the products of careful and thoughtful deliberation. Under the circumstances, we are convinced that the prosecutor's remarks had no material effect on the convictions.

Defendant also claims he was denied a fair trial when, during defense counsel's closing argument, one of the prosecutors made an objection, stating that defense counsel had been given "an opportunity for four years to present a defense." We find no merit in defendant's contention that the remark was an improper personal attack on his attorney or that it suggested that the defense had a burden to present evidence. Nor do we find any merit in the assertion that the State injected a prejudicial and irrelevant issue into the case by referring to the length of time which had elapsed before trial. The jury was aware that the crimes were committed in 1978. Since the trial took place in June of 1982, they were obviously aware that four years had elapsed. Accordingly, as the State points out, the jurors did not learn anything they did not already know. In addition, the court admonished the jurors that they should not concern themselves with the age of the case.

Defendant refers to a number of other comments which he claims were prejudicial, but since no objection was raised at trial, any error is waived. *People v. Gacy* (1984), 103 Ill. 2d 1, 88.

The defendant next contends that he was denied his right to trial by an impartial jury because the State exercised its peremptory challenges to exclude blacks solely on the basis of race. This court has previously discussed this issue at length and stated that only the systematic and purposeful exclusion of blacks from juries raises constitutional issues. (*People v. Mack* (1984), 105 Ill. 2d 103,

121-22; *People v. Williams* (1983), 97 Ill. 2d 252, 273-80; *People v. Davis* (1983), 95 Ill. 2d 1, 16-17.) Thus, there must be a showing that there has been a systematic exclusion on a case-after-case basis. (*People v. Payne* (1983), 99 Ill. 2d 135, 138; *People v. Williams* (1983), 97 Ill. 2d 252, 273-80.) The defendant in the present case failed to show that there was even a purposeful exclusion in his own case. Unlike many defendants who raise this issue, the defendant in the present case made a record of the identity of the prospective black jurors who were excused by use of the State's peremptory challenges. See *People v. Gaines* (1981), 88 Ill. 2d 342, 359.

The final jury contained 10 whites and 2 blacks. The State used peremptory challenges to excuse 12 blacks and tendered 4 blacks to the defendant as acceptable. A review of the *"voir dire"* questioning reveals that the State was not exercising its challenges "solely on the basis of race" but rather was exercising its challenges to exclude individuals who had facts in their background, such as criminal records or friends and/or relatives with criminal records, and other factors which might have prejudiced them against the State. A review of the *voir dire* questioning of 10 of the 12 black jurors excused by the State reveals the following about their backgrounds:

Juror D.M.—Had a brother who was recently charged with murder. The case had not yet gone to trial.

Juror J.C.—Had a criminal record, was convicted of robbery 33 years ago, charged with assault 10 years ago, charged with gambling since then.

Juror E.H.—Second cousin was presently incarcerated for "strongarmed" robbery.

Juror J.M.—Had an acquaintance charged with murder.

Juror A.J.F.—Had been foreman on a rape jury that ended up deadlocked; father had been charged with killing a man; found not guilty.

Juror T.D.—Pleaded guilty to involuntary manslaugh-

ter in 1974; brother found guilty of murder in 1958 but later won on appeal.

Juror Y.J.—Had a B.A. degree in criminal justice and sociology.

Juror A.S.—Knew a few "guys" charged with armed robbery and one for murder.

Juror W.B.—Grew up with individuals who ended up in prison; had one casual acquaintance serving time for homicide.

Juror P.A.—News producer for ABC television station which would be covering the trial; had a relative convicted of rape.

The defendant argues on appeal that it is significant that each of the jurors challenged by the State swore that they could be fair and impartial. This argument overlooks the function of the peremptory challenge and the realities of the trial setting. Every juror who is excused by use of a peremptory challenge has sworn that he can be fair and impartial; otherwise he would not have been qualified by the judge to serve and would have been excused for cause. The United States Supreme Court has examined the history and use of the peremptory challenge and stated:

"The function of the challenge is not only to eliminate extremes of partiality· on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. In this way the peremptory satisfies the rule that 'to perform its high function in the best way "justice must satisfy the appearance of justice." ' [Citation.] *** Although historically the incidence of the prosecutor's challenge has differed from that of the accused, the view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held.' [Citation.]" (*Swain v. Alabama* (1965) 380 U.S. 202, 219-20, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824,

835.)

Thus, just as a defendant should not be compelled to accept a juror whose brother has been murdered but who swears she can be fair and impartial, neither should the State be compelled to accept a juror whose brother has been accused of murder, but who swears she can be fair and impartial.

The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry, and without being subject to the court's control. (*Swain v. Alabama* (1965), 380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 836.) The Constitution does not require an examination of the prosecutor's reasons for exercising his peremptory challenges, and the presumption in any particular case is that the prosecutor is using the State's challenges to obtain a fair and impartial jury. (*Swain v. Alabama* (1965), 380 U.S. 202, 222, 13 L. Ed. 759, 773, 85 S. Ct. 824, 837.) Thus, our review of the *voir dire* questioning is not to examine or justify why the State exercised its challenges, but is merely to point out that the challenges were not exercised "solely on the basis of race" as the defendant contends. Furthermore, we feel that it is necessary to note that the challenges were not used solely on the basis of race because it has been alleged that a systematic and purposeful exclusion can be shown by the sheer number of cases raising this issue on appeal. As the present case shows, the mere fact that an issue is raised on appeal does not necessarily mean that there is any merit to it. As we stated in *People v. Mack*, "Regardless of the many emotional arguments on this question that have been raised in this court and in our appellate court, there is just no evidence that blacks are systematically and purposefully excluded from serving on juries in Cook County where the defendants are black." *People v. Mack* (1984), 105

Ill. 2d 103, 122

The defendant also contends that the trial court's excusal of one juror who admittedly would not consider the death penalty regardless of the evidence and the State's peremptory excusal of two other jurors who were equivocal on the death penalty denied him a fair trial because it resulted in a jury biased in favor of the prosecution. This court recently rejected similar arguments in *People v. Stewart* (1984), 104 Ill. 2d 463, 481-83, and *People v. Albanese* (1984), 104 Ill. 2d 504, 523-24. For the reasons stated in *Stewart* and *Albanese* we find defendant's argument here to be equally without merit. See also *People v. Collins* (1985), 106 Ill. 2d 237, 278-80.

Defendant next contends that his death sentence must be vacated and a new sentencing hearing held because of the State's (1) abusive and inflammatory cross-examination of the principal witness in mitigation; (2) recounting in open court of an obscene remark made by the witness; and (3) prejudicial remarks during closing arguments. Because we agree defendant was denied a fair sentencing hearing, we need only set forth those facts necessary to support our conclusion.

At the second phase of the sentencing hearing, defense counsel attempted to establish, as the sole mitigating factor, that defendant suffered from an extreme mental or emotional disturbance when he committed the crimes. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).) The primary witness relied upon by the defense was Dr. Marvin Ziporyn, psychiatric consultant to the Illinois Department of Corrections. Dr. Ziporyn testified he examined defendant in late May of 1981 pursuant to a court order. His initial examination, he said, strongly indicated actual physical damage to defendant's brain. As a result, Dr. Ziporyn ordered defendant to undergo an electroencephalogram (EEG) and a CAT scan, both of which showed no abnormality. Dr. Ziporyn also directed Dr.

Martin Scripp, a clinical psychologist, to administer a series of tests. According to Dr. Scripp's report, two tests, the Bender Gestalt Test and the Trial Making Test, indicated that defendant suffered from organic brain damage. Based upon his own examination, Dr. Scripp's report, and the report of another psychiatrist, Dr. Jordan Scher, who had found defendant to be suffering from a mental defect and unable to conform his conduct to the law, Dr. Ziporyn concluded that defendant suffered from "organic brain syndrome," a mental disorder characterized by actual damage to the brain. Dr. Ziporyn testified that, in his opinion, when defendant committed the crimes he was under the influence of extreme mental or emotional disturbance and he was unable to conform his conduct to the requirements of the law. Dr. Ziporyn then told the jury it was not significant that the CAT scan proved normal since it is primarily designed to detect major damage to the brain. Nor was it significant, he said, that the EEG was normal because a person suffering from organic brain syndrome often has abnormal brain activity only in intervals. If, therefore, the EEG is conducted between intervals, it will not register the abnormal brain waves. Dr. Ziporyn further testified that the results of another EEG performed on defendant strongly supported his conclusion that he suffered from extreme mental or emotion disturbance. That test, conducted in 1972, revealed abnormal brain activity, and the accompanying report indicated that the "results are often associated with rage attacks which occur episodically."

Under vigorous and intense cross-examination by Assistant State's Attorney Raymond Garza, Dr. Ziporyn admitted that he had been forced to resign from a psychiatric position at the Cook County jail because of an ethical controversy. He also stated he was unaware of EEG's performed on defendant in 1968, 1969, 1970 and

1978, all of which were normal. He was aware, he said, of another EEG conducted in 1981 which also was normal. He stated, however, that the results of those tests would not change his opinion but rather would strengthen it since the number of tests that were administered "would give support to my position this man is patently organic and *** a negative E.E.G. only means you're not catching the pathological activity." On further cross-examination Dr. Ziporyn testified that he was unaware that defendant took a Bender Gestalt test in 1978, the results of which showed no symptoms of organic brain damage. He further stated that he was unaware that four other doctors had previously examined defendant and found either no evidence of organic brain damage or that he was able to conform his conduct to the requirements of the law. The conclusions reached by those doctors, Dr. Ziporyn testified, would not cause him to change his opinion.

The record shows that as the cross-examination continued, it became more intense and oftentimes heated, with Assistant State's Attorney Garza charging that the witnesses' answers were unresponsive and Dr. Ziporyn asserting that the prosecutor was misstating his testimony. It is also clear that the focus of the cross-examination shifted from an attempt to discredit Dr. Ziporyn's diagnosis to humiliating and demeaning personal attacks against the witness. After questioning Dr. Ziporyn regarding what reports he took into account in making his diagnosis, the prosecutor remarked: "Can the jurors take your condition into account, Doctor?" The State contends that the comment was not prejudicial and alternatively that any prejudice was cured when the court sustained defense counsel's objection. We disagree. Viewing the cross-examination as a whole, it is clear that the comment was intended to degrade and insult the witness. Moreover, it was not an isolated occurrence. The

prosecutor went on to call Dr. Ziporyn "a liar," "a fraud," and "a member of the oldest profession known to man." The latter comment, the record plainly shows, was intended to portray the witness as prostituting his professional opinion. Defense counsel immediately objected, and the following colloquy took place:

"MR. FREEMAN [defense counsel]: Objection. Certainly there is something more important than a conviction and putting a man to death. Surely some justice and truth has some place in the proceedings.

[ASSISTANT STATE'S ATTORNEY ARTHUR]: That's what we have been seeking, a little truth.

MR. FREEMAN: You exhibit the—

[MR. GARZA]: What is the oldest living profession in the world?

[DR. ZIPORYN]: I believe the creation of chaos by Lawyers.

[MR. GARZA]: Or shrinks?

MR. FREEMAN: Are you going to put up with this, Your Honor?

THE COURT: Gentlemen, Mr. Garza, if you have a question I would call upon the witness to answer it."

The State does not attempt to justify the prosecutor's calling the witness "a member of the oldest profession known to man." It does assert, however, that Dr. Ziporyn's diagnosis could legitimately be described as fraudulent because he failed to learn the facts of the case before he reached his conclusion as to defendant's mental condition. The State maintains that Dr. Ziporyn did not read the police reports or the defendant's confession, and that he did not learn the facts of the case from the defendant. Consequently, it argues, it was fraudulent for Dr. Ziporyn to testify that defendant was insane when he did not know what the offense was.

The record does not support the State's contention. During cross-examination, Dr. Ziporyn testified that the defendant had talked to him about the murders. The

defendant had told him that he knew he was accused of murder but that he could not remember anything about the crimes. Dr. Ziporyn also stated that he was aware that the defendant had told other people different stories.

It is not apparent from the record whether Dr. Ziporyn read the police reports prior to making his diagnosis. Nevertheless, it is clear that he not only knew of defendant's confession but took it into consideration in concluding that defendant suffered from an extreme mental or emotional disturbance and that he was unable to conform his conduct to the requirements of the law. We therefore find no merit in the State's assertion that the doctor neither knew the nature of the crimes nor how they were committed.

To further support its claim that Dr. Ziporyn's findings were fraudulent, the State argues that the doctor "deliberately ignored" defendant's medical history—information which, it asserts, was vital to an accurate evaluation of defendant's mental condition. Again, the State's contention is untenable. Cross-examination established—and the State acknowledges—that when he made his evaluation Dr. Ziporyn had no knowledge of (1) the Bender Gestalt performed in 1978 which was normal; (2) the EEG's performed in 1968, 1969, 1970, and 1978 which were normal; and (3) the other doctors' reports which showed no evidence of organic brain damage. We find it paradoxical, to say the least, how Dr. Ziporyn could have "deliberately ignored" information which the State itself concedes he was unaware of. Moreover, given the testimony of the State's rebuttal witness, Dr. Gerson Kaplan, a psychiatrist with the Psychiatric Institute of the circuit court of Cook County, it cannot be said that the information was necessary, much less vital, for a proper evaluation of defendant's mental condition. On cross-examination Dr. Kaplan stated that, in diagnos-

ing organic brain syndrome, "[y]ou don't always have to have lab tests or different results from different sorts of tests; *that just talking to and examining the defendant in your office without any tests sometimes is sufficient to make the diagnosis.*" (Emphasis added.)

The State also directs our attention to the fact that Dr. Ziporyn refused to change his conclusion even though the EEG and CAT scan that he ordered revealed no abnormality. Yet, the prosecution introduced no evidence to contradict the doctor's testimony that a negative test result is not significant since abnormal brain activity often occurs episodically. Additionally, the State's rebuttal witness stated under cross-examination that one cannot say with certainty "that a person has a normal brain just because he has a normal EEG." We therefore cannot agree with the State's assertion that the failure of Dr. Ziporyn to change his conclusion because of the negative test results was evidence that his diagnosis was fraudulent.

The State also contends the prosecutor was justified in calling Dr. Ziporyn a liar because it was a legitimate inference from the evidence. This court has held that it is permissible for the prosecution to characterize a witness as a liar if the statement is based on the evidence and inference from it. For example, where a witness gives two different accounts of the same event, it is not improper for the prosecutor to state that the witness is lying. (*People v. Owens* (1984), 102 Ill. 2d 88, 105; *People v. Tiller* (1982), 94 Ill. 2d 303, 319.) In the present case, there is nothing to indicate that Dr. Ziporyn lied in his testimony, and the State does not refer to any portion of the record to substantiate its allegation. It must be remembered that Dr. Ziporyn was called to testify as an expert witness regarding his *opinion* of defendant's mental condition. Merely because other experts held different opinions can hardly be said to justify calling him a

liar. Further, it is significant to note that Dr. Ziporyn's diagnosis was not without support, since the reports of Dr. Scripp and Dr. Scher were consistent with his findings.

We agree with defendant that the remarks of Assistant State's Attorney Garza were improper and inflammatory and constituted nothing less than character assassination. While it is permissible to cross-examine a witness in order to explain, modify or discredit what he said on direct examination (*People v. Strother* (1972), 53 Ill. 2d 95, 99; *People v. Morris* (1964), 30 Ill. 2d 406, 409), cross-examination which is designed to harass, annoy or humiliate a witness should not be tolerated (*Smith v. Illinois* (1968), 390 U.S. 129, 133, 19 L. Ed. 2d 956, 959-60, 88 44 S. Ct. 748,750-51; *People v. Duncan* (1913), 261 Ill. 339, 354-55; *People v. Brown* (1912), 254 Ill. 260, 269; *People v. Sparkman* (1979), 68 Ill. App. 3d 865, 869). That it was inexcusable, grossly unprofessional and highly inflammatory for the prosecutor to characterize the witness as a prostitute deserves, we think, no further comment. Taken together with the other insulting and demeaning comments of the Assistant State's Attorney, there is no question that Garza sought to humiliate and degrade the witness in the eyes of the jurors. As this court said in *People v. Brown* (1912), 254 Ill. 260, 269, such conduct "is reprehensible in the highest degree and deserves the strongest condemnation of the court ***."

The situation was further exacerbated by Garza's conduct immediately following Dr. Ziporyn's testimony. As Dr. Ziporyn left the stand, Assistant State's Attorney Arthur and defendant's counsel were called to the bench to discuss a number of administrative matters. Dr. Ziporyn, meanwhile, approached the prosecution's table where Assistant State's Attorney Garza was seated and directed—apparently in a low tone of voice—an obscene

and disgusting epithet at the prosecutor. Dr. Ziporyn was subsequently convicted of indirect criminal contempt, and we affirmed his conviction in *People v. Ziporyn* (1985), 106 Ill. 2d 419. It cannot be established from the record here or from the record of the doctor's contempt trial whether any of the jurors heard Ziporyn's remark. It is undisputed, however, that everyone in the courtroom, including the jurors, became aware of what had been said when Assistant State's Attorney Garza jumped up and in a loud voice repeated the remark and demanded that Dr. Ziporyn be held in contempt. The court then quickly excused the jury with an admonishment not to discuss the matter, after which the following discussion took place:

"MR. FREEMAN: Judge, now that the Jury is gone let me say to Your Honor if this were an ordinary kind of case I would move for a mis-trial, but I move for a dismissal once and for all for any sentencing hearing.

If what Counsel said was true, which I have no way of knowing, but if it were true, to make that statement in front of this Jury, how can the Defendant ever receive any kind of fair trial regardless of whether it was true or false. The Defendant didn't say it; I didn't say it.

For Garza to make that statement in front of this Jury there is no chance of us ever receiving an unprejudiced hearing on the real issues of the case.

I think it is so ridiculous and cannot find the words. I would have shared his outrage if he said that to me, but for a Lawyer to say that in front of a Jury and thus to taint the Defendant is absolutely incomprehensible and I don't know what you can do, except to dismiss this hearing and that's not the only thing.

The constant attack by Mr. Garza referring to me in front of the Jury along with the witness of making a circus of the Court and other accusations, the totality is indefensible, is unbelievable and more importantly, Judge, it simply makes it impossible for this Defendant to have a fair hearing on the merits now that Garza has tainted

both the Lawyer and the witness.

THE COURT: Just a minute, Mr. Freeman.

He has, number one, not obviously attributed that to the Defendant or to you.

Number two, there was in cross-examination some heated exchange. I don't see that that is going to affect the question of the issues in this case.

Considering, as I say, the entire context, and would the witness [Dr. Ziporyn] please step forward?

Outside of the hearing of the Jury—

MR. ARTHUR: I submit at this point he should probably be given his Miranda Warnings, Judge.

MR. FREEMAN: That is intimidating enough.

MR. ARTHUR: Oh, who could intimidate him? Give me a break.

* * *

MR. FREEMAN: Your Honor, this witness—

MR. ARTHUR: Can I speak, Freeman?

MR. FREEMAN: Shut up. I am sure the Jury can hear every rotten word coming from his mouth now on behalf of Mr. Arthur screaming what he had to say in the kind of voice which the Jury couldn't help overhearing.

MR. ARTHUR: This record should reflect that the Courtroom doors are closed.

* * *

MR. ARTHUR: This record should reflect the witness went up to the chair where my partner was sitting no more than eight or ten feet from the presence of the Jurors, my partner stood there and I started to the bench when a side bar was going on and the witness went over, leaned over to talk to him.

Mr. Garza, and the Court saw this, ignored the man's presence and he stood there and my partner represented to the Court what the man said.

I am prepared to go to hearing. Not only my partner but other witnesses heard this and I demand that the man be put away.

MR. FREEMAN: Does Counsel represent the Court has personal knowledge what he stated?

MR. ARTHUR: I am ready for hearing, Freeman.

MR. FREEMAN: I am ready for hearing. I want to know what the Court is going to do about what Garza said.

* * *

THE COURT: I am sorry that it became necessary for Mr. Garza—became necessary to comment on it.

MR. FREEMAN: It is not necessary.

THE COURT: If it was said to Mr. Garza I regret it was said to Mr. Garza.

MR. FREEMAN: I join that.

THE COURT: Mr. Garza?

MR. GARZA: That witness stood in my ear whispering something to me. I tried to ignore him. He whispered to me again, Mr. Garza. I looked directly in the eye of the witness. People ten feet away could hear what he said and he said '***' and, Judge, to tell you the truth, I wanted to deck the man right there.

I didn't know how else to bring it to your attention, except, inform you, because it is so outside the propriety it shocks my conscience.

The man made a circus of the Courtroom.

He is a whore and conducted himself as a whore.

That's what he did. I want to swear to it and the man should be held in contempt.

Let's get him a Lawyer and let's put the man to the test and see if he can tell the truth.

MR. FREEMAN: I want the Court to determine what it is going to do with Mr. Garza that he has to make the remark in front of the Jury.

THE COURT: The Jury not only knows enough to disregard it as it has nothing to do with the merits of the case or merits of the hearing but they will be again admonished to disregard any reference that was made after the witness left the stand.

This, frankly, was not heard by me.

* * *"

When the proceedings reconvened the following day, the judge, in part at the urging of Assistant State's Attorney Arthur, admonished the jury to disregard the incident of the previous day. He instructed them:

"[I]n no way should that incident be considered by you as having anything to do with this case or any of the merits of this case or this hearing and in no way should it be held against either the defendant or his counsel *** and I ask you and admonish you to disregard that incident and to put it completely out of your mind ***."

The State asserts that it is "reasonably certain" that some of the jurors heard Ziporyn when he directed his filthy comment at the assistant State's Attorney. Even if only one juror heard him, it maintains the others would have learned of the remark during deliberations, and therefore defendant was not prejudiced when Garza brought the matter to the jury's attention. We will not speculate over whether any of the jurors heard what had been said to Garza, for our concern is not with whether any members of the jury initially heard the comment, but with Garza's conduct in loudly repeating it.

Prosecutorial remarks which serve no purpose but to inflame the emotions of the jury are highly improper and have no place in the sentencing phase of a capital trial. (*People v. Albanese* (1984), 102 Ill. 2d 54, 81; *People v. Szabo* (1983), 94 Ill. 2d 327, 363-64; *People v. Tiller* (1982), 94 Ill. 2d 303, 321.) Indeed, we have said that prosecutors must exercise the utmost caution in capital cases to avoid the use of such comments. *People v. Albanese* (1984), 102 Ill. 2d 54, 81; see also *People v. Szabo* (1983), 94 Ill. 2d 327, 364; *People v. Jones* (1982), 94 Ill. 2d 275, 286.

The State attempts to justify Garza's conduct by arguing that he was warranted in asking that the witness be held in contempt because it was essential to act quickly in order to preserve the court's contempt powers. Yet the State fails to explain why it was necessary to loudly repeat the obscene epithet in front of the jury. As we said in *People v. Ziporyn*, (1985), 106 Ill. 2d 419, 421-22, although it was foreseeable that the remark

would prompt action on the part of the prosecutor, it was certainly not foreseeable that he would repeat the epithet and demand loudly in open court that the witness be held in contempt.

While we are not aware of any case in which a court has confronted the situation presented here, we find the facts in *People v. Duncan* (1913), 261 Ill. 339, somewhat analogous. In *Duncan*, the court found that the prosecutor's cross-examination of one of the defendant's witnesses was designed solely to "degrade and disgrace her in the eyes of the jury." Then, as the witness was about to leave the stand, the prosecutor, apparently dissatisfied with the answers he had received, stated that he wanted to swear out a complaint and have the witness charged with perjury. In reviewing the propriety of the prosecutor's conduct, this court said:

> "This action of the State's attorney was inexcusable. If he felt that the witness should be prosecuted for perjury he should have gone about procuring her arrest in an orderly manner. It was not necessary for him to make this statement in the presence of the jury." 261 Ill. 339, 355.

Garza's conduct here, like that of the prosecutor in *Duncan*, was inexcusable. While it is undisputed that he was the recipient of a vile and obscene epithet, there was simply no reason to loudly repeat the remark in front of the jury. If his sole objective was to have Ziporyn held in contempt, he could have proceeded in an orderly fashion to approach the bench and inform the court of what had been said. That he chose instead to loudly repeat the remark in the jury's presence leads us to believe that he was not interested merely in preserving the court's contempt power but in further inflaming the passions and emotions of the jury against the defendant's primary witness in mitigation. Our belief is reinforced by a number of factors. First, in his testimony at Ziporyn's contempt trial, Garza admitted that he did not know if any of the jurors had heard Zi-

poryn make the obscene comment. Consequently, for him to then stand in front of the jury and loudly repeat what had been said indicates that he was intent on insuring that the incident did not go unnoticed. In other words, it would appear to us that he was not about to risk the possibility that someone on the jury had not heard the remark. Second, even conceding the obscene and outrageous nature of the comment, we find it difficult, in light of some of the language and conduct exhibited by Garza throughout the trial, to accept his explanation that the remark so shocked his conscience that he didn't know how else to bring the matter to the court's attention. Finally, it strikes us as incredible that an experienced prosecutor would not have known that the remark would serve nothing but to inflame and antagonize the jury against Ziporyn. In this regard we note that at no time did either Garza or his co-counsel, Assistant State's Attorney Arthur, argue that Ziporyn's obscene comment had any relevance to the sentencing hearing. On the contrary, the record shows that, before the hearing reconvened, Arthur urged the court to again instruct the jury to disregard what had been said. Nevertheless, the State now asserts that Ziporyn could have been recalled to the stand and interrogated about his statement because it was relevant to show his bias against the prosecution. Inasmuch as the remark had nothing to do with the merits of the hearing, there is no merit to the State's contention.

Given the total absence of any justifiable reason for Garza's conduct, we are compelled to conclude that his recounting of the obscene remark was designed to introduce into the proceedings a matter which would serve only to inflame the passions and emotions of the jury to the end that Ziporyn's testimony would be totally rejected. Such a blatant disregard for defendant's right to a fair sentencing hearing is reprehensible and cannot be condoned. Moreover, considering the nature of the remark, we are not pre-

pared to say that any prejudice to the defendant was cured by the trial court's admonishment to the jury to disregard the entire matter. See *People v. Baptist* (1979), 76 Ill. 2d 19, 30, and *People v. Garreau* (1963), 27 Ill. 2d 388, 391 (recognizing that not all prejudice can be erased by an admonishment from the court).

The following remarks by Garza in his rebuttal closing argument at the sentencing hearing, while standing alone may not constitute cause for vacating the sentence, nonetheless, exacerbated an already prejudically inflamed atmosphere.

> "[MR. GARZA]: Don't buy sending Enice Lyles back to the Penitentiary. We are not going to leave it up to some supervisory authority who releases him in eight years.
>
> MR. FREEMAN: Object to that. That is absolutely irrelevant. I would ask the Court to tell the Jury to disregard that.
>
> THE COURT: Disregard anything in particular about the sentence.
>
> MR. GARZA: Well, you know what happened to him the first time he committed murder.
>
> MR. FREEMAN: Your Honor, it is the same evidence. I object.
>
> THE COURT: This is not evidence.
>
> MR. GARZA: He served fifteen [*sic*] years of a twenty-five year sentence.
>
> MR. FREEMAN: I object to that. That is absolutely improper.
>
> He has no concept of what anybody is going to do on this, Your Honor.
>
> MR. GARZA: That's right.
>
> MR. FREEMAN: He doesn't know if Your Honor is going to sentence him to natural life, but he doesn't know—
>
> THE COURT: Mr. Freeman, he is commenting on the evidence.
>
> MR. FREEMAN: The cases have said it is absolutely reversible error. He doesn't know what Your Honor will

do.

MR. GARZA: No. I am not worried about what the Judge is going to do. I am worried about him getting out again.

MR. FREEMAN: Objection, Your Honor. I would ask the Court to instruct the Jury to disregard it and Counsel to be admonished.

THE COURT: The instructions will speak for themselves, Mr. Freeman.

MR. GARZA: After committing the murder that he did that you heard about in 1968, after eight years he was found well enough to go back and live in society.

MR. FREEMAN: Same objection, Your Honor, and same request of the Court. That is not the evidence."

This court has said that it is not a proper function of a prosecutor to speculate as to what might occur if an accused is not sentenced to death. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 365-68; *People v. Szabo* (1983), 94 Ill. 2d 327, 366.) In *People v. Walker* (1982), 91 Ill. 2d 502, 515, we noted that if the jury concludes, after weighing the aggravating and mitigating factors, that the defendant should not be executed, "then the fact that he may eventually be paroled *** does not mean that he should be executed to prevent that possibility. By injecting the parole consideration into the penalty determination, the jury is diverting its attention from the offense and the offender, and is focusing upon a speculative possibility that may or may not occur."

The State contends Garza's comments were invited by defense counsel's preceding argument, and citing *People v. Garcia* (1983), 97 Ill. 2d 58, and *People v. Williams* (1983), 97 Ill. 2d 252, it asserts defendant cannot now be heard to complain that the remarks were improper. The State's reliance on *Garcia* and *Williams* is misplaced. In those cases defense counsel assured the jury that if it did not vote to impose the death penalty, the court would sentence the defendant to life imprison-

ment with no possibility of parole. No such claim was made in the present case. Defense counsel here pointed out that even though it was obvious that defendant had "mental difficulties," he never received any psychiatric treatment for his condition during his incarceration for a murder committed in 1968. He went on to say that "when [the parole authorities] let him out ten months before this murder they said as part of his parole that he, quotes, must submit to out-patient care as prescribed by the Mental Health Clinic under close supervision, end quotes. That was the parole order." Nothing in these statements can be said to have invited the remarks complained of here.

Alternatively, the State contends that Garza's argument was proper because it did not refer to the speculative possibility of parole but rather to the actual fact that defendant had been paroled after a murder conviction. If we were to read his remarks as the State now interprets them, we would find no impropriety. We cannot, however, agree with the State's interpretation. Garza urged the jury not to send defendant back to the penitentiary so that some supervisory authority could release him in eight years. Then, after directing the jury's attention to defendant's parole following his first murder conviction, he said he was "worried about him getting out again." We think the unmistakable import of his argument was that defendant should be put to death because of the possibility that he might be paroled in the future. The argument served only to "prey upon the fears of the jurors that the defendant may soon walk the streets again in search of another victim." *People v. Szabo* (1983), 94 Ill. 2d 327, 367.

The acts of misconduct here—only a portion of which have been documented in this opinion—deserve the strongest condemnation. An assistant State's Attorney, it must be remembered, "is the representative of all the

people, including the defendant, and it is as much his duty to safeguard the constitutional rights of the defendant as those of any other citizen." (*People v. Oden* (1960), 20 Ill. 2d 470, 483; see also *People v. Gregory* (1961), 22 Ill. 2d 601, 604.) To be sure, he is expected to prosecute with earnestness and vigor, but " 'while he may strike hard blows, he is not at liberty to strike foul ones.' " (*United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 7, 105 S. Ct. 1038, 1042, quoting *Berger v. United States* (1935), 295 U.S. 78, 88, 79 L. Ed. 1314, 1321, 55 S. Ct. 629, 633.) As a prosecutor he has an obligation to comport himself in a manner which not only ensures that the defendant receives a fair sentencing hearing but which inspires respect for the administration of justice. Neither of these objectives was achieved in this case. Given the record here, there is a strong possibility that defendant's sentence was imposed under the influence of passion or prejudice. Accordingly, we must vacate defendant's sentence and remand the cause for a new sentencing hearing. *People v. Szabo* (1983), 94 Ill. 2d 327, 367.

While our decision to vacate defendant's death sentence is based on what occurred in the jury's presence, we are compelled to comment on the prosecutors' conduct during in-chambers discussion. The record plainly reflects an extremely hostile relationship between the two prosecutors and defendant's attorney. During one in-chambers discussion, defense counsel was called "a liar" and "a son of a bitch." On another occasion Assistant State's Attorney Garza took it upon himself to abruptly walk out of chambers, and in the process he made an obscene gesture at defense counsel. The record also shows that the prosecution attempted to establish, through the testimony of State Senator George Sangmeister, that three years after the murders involved here, the legislature made it a crime to cause the death of a fetus. (See

Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1.) A defense objection to the testimony was sustained. At a side bar held in the judge's chambers Garza stated, "*** I can't believe he makes an objection on hearsay, a God damn hearsay objection in a God damn sentencing hearing." (We note in passing that the basis for not only defense counsel's objection but the court's ruling was that the evidence was irrelevant.) Finally, we observe that on a number of occasions the prosecutors criticized the court for sustaining defense objections, thereby prompting the following remarks by the trial judge: "Mr. Arthur, I am going to admonish you just once. You have taken on this Court. You have made some personal attacks of [*sic*] the Court outside the presence of the jury and I am just going to admonish you once."

The obscene and profane language used by the prosecutors, and their conduct, in the courtroom and in the judge's chambers, destroyed the aura of dignity which, tradition holds, should cloak all judicial proceedings. Such language and conduct are demeaning to the legal profession and reflect a total lack of respect for the integrity and authority of the court. It would appear that an individual who has had the number of years of formal education required to become an attorney would have developed a vocabulary which would enable him to express himself without resorting to the profane and obscene language of the gutter. We find a recent observation by the Supreme Court in *United States v. Young* (1985), 470 U.S. ___, 84 L. Ed. 2d 1, 105 S. Ct. 1038, relevant to the conduct and language of the prosecutors in this case.

"The kind of advocacy shown by this record has no place in the administration of justice and should neither be permitted nor rewarded; a trial judge should deal promptly with any breach by either counsel. ***
*  *  *
We emphasize that the trial judge has the responsibil-

ity to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.' " *United States v. Young* (1985), 470 U.S. ___, ___, ___, 84 L. Ed. 2d 1, 8, 9, 105 S. Ct. 1038, 1043, 1044.

We agree with the above statement and conclude that the trial judge should not have permitted such disruptive conduct of counsel.

The defendant cites numerous other challenges concerning his sentencing hearing and the imposition of the death penalty. As we have already determined that the cause is to be remanded for a new sentencing hearing, we feel that it is only necessary to address those issues which might reappear on remand.

The defendant contends that the trial court erred by allowing unreliable hearsay testimony concerning the 1968 conviction during the second phase of the sentencing hearing. It is well established that section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)) allows the introduction of evidence during the second phase of the sentencing hearing regardless of whether it would be admissible during the guilt phase of the trial. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Davis* (1983), 95 Ill. 2d 1, 43; *People v. Free* (1983), 94 Ill. 2d 378, 421-27.) During the second phase of the sentencing hearing the factors controlling the admission of evidence are relevance and reliability, and the determination of admissibility lies within the sound discretion of the trial judge. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Davis* (1983), 95 Ill. 2d 1, 43.) Thus the question to be answered on appeal is whether the trial court abused its discretion by allowing the testimony. See *People v. Free* (1983), 94 Ill. 2d 378, 423-24.

The testimony complained of concerned the defend-

ant's involvement in the 1968 murder and attempted murder of two youth camp guards. The defendant subsequently pleaded guilty to the charges. The complained-of testimony was given by Senator George Sangmeister. Sangmeister had been State's Attorney of Will County and had personally investigated the incident and prosecuted the defendant. During his testimony, Sangmeister referred to statements made to State Police investigators by a codefendant, another inmate, and the guard who survived the attack. Defendant contends that the trial court abused its discretion by allowing Sangmeister to testify concerning these statements which were made outside his presence. We disagree.

Sangmeister stated that he learned the content of the statements from the investigators who interviewed the various witnesses. The investigators incorporated the statements into their written reports concerning the incident. Sangmeister stated that he relied on the statements and reports, among other things, when deciding to prosecute the defendant as an adult. He also incorporated the statements in the State's Attorney's statement-of-facts letter which was forwarded to the Department of Corrections when the defendant was processed. Finally, the statements were strongly corroborated by the fact that the defendant pleaded guilty to the charges. Again, the factors controlling the admission of evidence during the second phase of the sentencing hearing are relevance and reliability. (*People v. Davis* (1983), 95 Ill. 2d 1, 43.) Given these facts, we do not believe the trial court abused its discretion by allowing the testimony.

The defendant also contends that the testimony concerning the confession of his 1968 codefendant, which implicated the defendant in the incident, was improper because it violated his right to confrontation as established in *Bruton v. United States* (1968), 391 U.S. 123,

20 L. Ed. 2d 476, 88 S. Ct. 1620. The situation in *Bruton* concerned the introduction of a codefendant's confession during the guilt phase of a joint trial. In *People v. Davis* (1983), 95 Ill. 2d 1, we discussed the *Bruton* decision at length and held that the situation in *Bruton* was not analogous to the situation at the second phase of the sentencing hearing. *People v. Davis* (1983), 95 Ill. 2d 1, 47. We adhere to that holding.

The defendant next contends that the trial court erred by allowing the State to introduce the testimony of Dr. Gerson Kaplan, a psychiatrist who examined the defendant pursuant to court order. Dr. Kaplan testified during the second stage of the sentencing hearing to rebut the testimony of Dr. Ziporyn and Dr. Scripp, who testified for the defendant. The defendant contends that the use of Dr. Kaplan's testimony violated his fifth amendment privilege against self-incrimination and section 115—6 of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1977, ch. 38, par. 115—6). Section 115—6 allows the trial court to order a psychiatric examination of the defendant by a court-appointed expert and provides in part that "[a]ny statements made by defendant to such experts shall not be admissible against the defendant unless he raises the defense of insanity * * *, in which case they shall be admissible only on the issue of whether he was insane." (Ill. Rev. Stat. 1977, ch. 38, par. 115—6.) This same issue was addressed and rejected in *People v. Silagy* (1984), 101 Ill. 2d 147, 174-75. As we stated in *Silagy,* section 115—6 must be read in conjunction with section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e)), which allows for the introduction of evidence at the second stage of the sentencing hearing regardless of its admissibility at trial. Thus, the limitation of section 115—6 is not applicable to the second stage of the sentencing hearing. See *People v. Silagy* (1984), 101 Ill. 2d 147, 174.

Nor do we believe that the use of the testimony infringed on the defendant's fifth amendment privilege against self-incrimination. The defendant relies on *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, in support of this argument. The *Estelle* decision is not analogous to the present case because the psychiatric testimony in *Estelle* was initially introduced by the State at the sentencing hearing to carry its burden of proof of showing that the defendant would be dangerous in the future. In the present case the initial psychiatric testimony was introduced by the defense to prove, as a mitigating factor, that the defendant was suffering from an extreme mental or emotional disorder. It is well established that a defendant who raises the insanity defense may constitutionally be subjected to compulsory examination by a court-appointed psychiatrist and that if the defense introduces psychiatric testimony at trial in support of the insanity defense the testimony of the court-appointed psychiatrist on the issue of sanity may be received as well. (*United States v. Byers* (D.C. Cir. 1984), 740 F.2d 1104, 1115; *Vardas v. Estelle* (5th Cir. 1983), 715 F.2d 206, 208-10; *United States v. Cohen* (5th Cir. 1976), 530 F.2d 43, 47-48; see Ill. Rev. Stat. 1977, ch. 38, par. 115—6.) We hold that the same rationale is applicable when the defendant initially introduces psychiatric testimony to establish a mental or emotional disorder as a mitigating factor at the sentencing hearing. Thus, the testimony of Dr. Kaplan did not deprive the defendant of his fifth amendment privilege against self-incrimination.

The defendant also argues that it was error for Dr. Kaplan to testify concerning the opinions and conclusions of six nontestifying experts who had examined the defendant. Dr. Kaplan testified that the opinions and conclusions of the nontestifying experts were consistent with his diagnosis. Dr. Kaplan's testimony concerning the non-

testifying experts opinions was based on his examination of their records and reports. The defendant cites *Wilson v. Clark* (1981), 84 Ill. 2d 186, and *People v. Ward* (1975), 61 Ill. 2d 559, in support of his argument. In *People v. Del Vecchio*, we rejected this same argument and the cases cited on the grounds that "[t]he evidence was admitted at the sentencing hearing pursuant to section 9—1(e) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(e))," and that "this section suspends the rules of evidence so that the jury may have all relevant information before it." *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 437-38.

For the reasons stated in *Del Vecchio*, we again reject this argument.

For the reasons stated herein, the defendant's convictions of murder are affirmed. The sentence of death is vacated, and the cause is remanded to the circuit court of Cook County for a new sentencing hearing.

*Affirmed in part; sentence
vacated; cause remanded,
with directions.*

JUSTICE SIMON, concurring:

In this case I do not find fault with the way peremptory challenges were used to eliminate black persons, for it appears there were reasons for their exclusion other than race, except perhaps in the exclusion of juror Y.J. However, the majority, in discussing the law applicable to the use of peremptory challenges, relies on *People v. Mack* (1984), 105 Ill. 2d 103, *People v. Payne* (1983), 99 Ill. 2d 135, *People v. Davis* (1983), 95 Ill. 2d 1, and on *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824. In view of this reliance, I again express my disagreement with the holdings of those cases with respect to the use of peremptory challenges and refer to my dissents in *Mack, Payne* and *Davis*. With this exception I agree with the majority opinion.