NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210244-U

NO. 4-21-0244

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 19, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| HERBERT C. SHAH, | ) | No. 19CF957 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| | ) | Judge Presiding. |

JUSTICE BRIDGES delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in denying defendant new counsel after a *Krankel* hearing. Defendant failed to show that his trial counsel provided ineffective assistance. Defendant forfeited the issue of whether the prosecutor made improper remarks regarding DNA during closing argument, and regardless, the prosecutor's statements were proper in light of defense counsel's cross-examination and further did not amount to prejudicial error. There was sufficient evidence to show that defendant fired a gun in the direction of a person. Therefore, we affirm.

¶ 2     Following a jury trial, defendant, Herbert C. Shah, was convicted of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) and unlawful possession of a weapon by a felon on mandatory supervised release (MSR) (720 ILCS 5/24-1.1, 730 ILCS 5/5-5-3(c)(2)(F) (West 2018)). On appeal, defendant argues that (1) the trial court erred in refusing to appoint new counsel following a *Krankel* hearing on defendant's claim of ineffective assistance of counsel, (2) his trial counsel was ineffective, (3) the prosecutor made improper statements during closing argument, and (4) he was not proven guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            On July 1, 2019, defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)) (count I), possession of a stolen firearm (720 ILCS 5/24-3.8(a) (West 2018)) (count II), and two counts of unlawful possession of a weapon by a felon on MSR (720 ILCS 5/24-1.1, 730 ILCS 5/5-5-3(c)(2)(F) (West 2018)) (counts III and IV). On August 31, 2020, the trial court dismissed count II pursuant to the State's request.

¶ 5            Defendant's first jury trial began on September 1, 2020. Three days later, the jury found defendant not guilty of count IV and was unable to reach a verdict on counts I and III. A second trial on those counts began on November 4, 2020.

¶ 6            Tennille Perring testified as follows. On June 22, 2019, at about 6 p.m., she and her husband were driving near the intersection of Neil and Green Streets in Champaign. They were stopped at a traffic light, and she heard a lot of commotion outside the door of Hollywood Liquors. Perring heard female voices screaming and then gunshots. She saw an African American man with a light-colored T-shirt and jeans holding a handgun with a pink bottom and shooting at the driver's side of a parked SUV, resulting in multiple windows being shot out. Perring could not see anyone in the SUV. The police later asked if she would be comfortable doing a photo lineup, and Perring said that she would not because of the angle that she saw the shooter.

¶ 7            Jose Perez testified that shortly before 6 p.m. on the day in question, he and his wife were in their car in a parking lot across the street from Hollywood Liquors. He saw two black men arguing, and he started video recording the incident on his wife's phone. The men started throwing punches. One of the men then got into a Trailblazer SUV while still talking, and the other man went to the passenger side of another car, pulled out a black gun, and started shooting at the man in the SUV. The shooter was wearing a white T-shirt and had on an orthopedic boot. Perez stopped

recording the video when the shots were fired. The video, which showed only the men throwing punches at each other, was played for the jury.

¶ 8        Tiara Ivy, defendant's girlfriend, testified that she and defendant were at Hollywood Liquors on June 22, 2019. Defendant got into a fight with a man in the parking lot, and she identified defendant in an image from the video wearing a white shirt, jeans, and a medical boot. The fight ended, and she went inside the store with her keys. She heard the shooting but did not see it. She left in the car without defendant. Ivy later found out the street name of the man defendant had fought with, and it was someone who had threatened her on the Internet prior to the fight.

¶ 9        Crystal Orr testified that she was driving out of a parking lot into the intersection of Neil and Green streets when she heard gunshots. She saw a black man on foot running out of the Hollywood Liquors parking lot and heading north on Neil Street. He was wearing orange boxer shorts that were falling down, but Orr did not recall if he had pants or shorts on over them. She did not see anything in his hands. Orr was waiting at a red light and lost sight of the man.

¶ 10        Cully Schweska testified that he was a detective with the Champaign Police Department. On June 22, 2019, based on a meeting at the police department with someone who wished to remain anonymous, he looked for the flight path of the suspect. On top of a roof of a business just north of 512 Neil Street, he found a pink Ruger LCP handgun.

¶ 11        Detective Corey Phenicie of the Champaign Police Department provided the following testimony. At about 10 p.m. on June 22, 2019, Emotion McFall-Dorsey brought her Chevrolet Trailblazer to the police department to be photographed. McFall-Dorsey admitted being at the scene of the incident. Her boyfriend was Robert Grady. Phenicie never interviewed Grady because he was unable to locate him, and was therefore also not able to serve him with a subpoena.

However, Sergeant David Griffet of the Champaign Police Department was able to speak to Grady around June 25, 2019. After that, no one on Detective Phenicie's team was able to contact Grady. The police conducted three photo lineups, one with an anonymous witness, one with McFall-Dorsey, and one with a woman named Torrey, who was a driver for Jet's Pizza and was present when the argument occurred. No one identified defendant in the photo lineups. Detective Phenicie spoke to Perez on the day of the shooting, and Perez said that the shooter had an orange-colored gun. Perez said that his wife had recorded the video.

¶ 12        Detective Kaitlin Fisher testified that on June 26, 2019, she administered a photo line-up to Torrey, who identified the photo of a man in the second position of the sheet. Fisher did not know the identity of the person in the photo.[1]

¶ 13        Sergeant Griffet testified that he came into contact with Grady on June 25, 2019, for an unrelated matter. Grady had been documented as a victim of the incident, and Griffet attempted to speak with him about the case; it was the first time the police had the opportunity to communicate with him. Grady said that he had no desire to make a statement in the case, that the incident was recorded, and that the police did not need him. Grady's level of cooperation was "[v]ery poor," and Griffet did not think that Grady would participate in court proceedings related to the case.

¶ 14        The State presented evidence that a search warrant was executed at defendant's home, and the police recovered a medical boot. The bottom of the boot had some pebbles in the tread, and some of the treads were scuffed. The State further presented evidence that four projectiles were found inside the Chevrolet Trailblazer, and it was likely that two projectiles had

---

[1]It is undisputed that Torrey did not identify defendant in the photo lineup.

fallen outside of the vehicle. An expert in firearms examination testified that the recovered bullets and casings came from the pink gun that was recovered.

¶ 15 Svetlana Gershburg, a forensic scientist for the Illinois State Police, was admitted as an expert in the field of DNA analysis, and she testified as follows. There are 23 pairs of chromosomes on a DNA profile. She compared defendant's DNA profile to two DNA samples from the gun that was recovered. One of the samples had a mixture from two people, and Gershburg could interpret the contributor at 3 of 23 locations. Defendant could not be excluded as a contributor, and the statistical frequency was that 1 in 1300 people could be a contributor. The second DNA sample from the gun had at least three contributors that she could interpret at four locations. Defendant could not be excluded as a contributor, and 1 in 37,000 people could be a contributor to the profile. Forensic scientists could not say that a person's DNA "matched" a DNA profile. The statistical probabilities related to everyone in the world, and people did not have to be related to share DNA sequences. One in 1300 was not considered a rare frequency but rather would be pretty common. Gershburg could not be confident that DNA belonged to a particular individual when 4 out of 23 loci were examined.

¶ 16 The jury found defendant guilty of both counts. Defendant, through his attorney, filed a motion to reconsider and for a new trial on December 4, 2020. Defendant later wrote a *pro se* letter filed on December 29, 2020, alleging that his trial counsel was ineffective because although Grady had signed an affidavit stating that defendant was not the shooter, counsel "suppressed" this information and did not use it at trial. Defendant attached the affidavit, which stated that Grady and defendant had engaged in a fist fight; shots were then fired in their direction; and the person doing the shooting was not defendant, but rather it was an unidentified black male

- 5 -

in his mid-twenties. The trial court held a *Krankel* hearing on December 30, 2020, and denied defendant the appointment of new counsel to pursue an ineffective assistance of counsel claim.

¶ 17    The trial court denied defendant's motion to reconsider on February 9, 2021. The trial court sentenced defendant to 22 years' imprisonment for aggravated discharge of a firearm and 10 years' imprisonment for unlawful possession of a weapon by a felon on MSR, to be served concurrently.

¶ 18    Defendant timely appealed.

¶ 19                    II. ANALYSIS

¶ 20                    A. *Krankel*

¶ 21    Defendant first argues that the trial court erred in denying him the appointment of independent counsel on his claim of ineffective assistance after the *Krankel* hearing. *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny govern the procedure for *pro se* posttrial claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 1. Once a *pro se* defendant brings such a claim to the trial court's attention either orally or in writing, the trial court must inquire into the factual basis of the defendant's claim. *Id.* ¶ 11. The trial court may consider the factual and legal merits of the allegations of ineffective assistance. *People v. Roddis*, 2020 IL 124352, ¶ 70. The court may "base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *People v. Moore*, 207 Ill. 2d 68, 79 (2003). If the trial court finds that the claim lacks merit or pertains to trial strategy, the trial court may deny the motion. *Ayres*, 2017 IL 120071, ¶ 11. Conversely, if the trial court finds that the allegations show possible neglect of the case, the trial court should appoint new counsel to represent the defendant on the motion. *Id.* Whether a trial court has properly conducted a *Krankel*

preliminary inquiry is a question of law that we review *de novo. People v. Jackson*, 2020 IL 124112, ¶ 98. If the trial court has done so and has reached a determination on the merits of the motion, we will reverse the trial court's ruling only if it is manifestly erroneous. *Id.* "Manifest error is error that is clearly evident, plain, and indisputable." *Id.* Here, defendant challenges the trial court's denial of his request for new counsel rather than arguing that the trial court did not conduct a proper *Krankel* inquiry, so we review its ruling for manifest error.

¶ 22        Defendant's letter claiming ineffective assistance raised only one issue, that of Grady, but during the *Krankel* hearing he raised approximately 19 claims. The trial court stated that 17 of the claims were conclusory allegations with no factual support, pertained to trial strategy, or were subjects known to the court through its participation in the proceedings. The trial court touched upon those issues before stating that it had two issues that it wanted to inquire of defense counsel. One issue was what investigation counsel had done regarding Grady, and the other was whether counsel had talked to witnesses Torrey[2] (see *supra* ¶ 11) and Tyler (see *infra* ¶ 24).

¶ 23        Defense counsel stated as follows. Defendant had two jury trials in six months, the first of which he was found not guilty of one count and had a hung jury on the remaining counts. She had received Grady's affidavit with discovery. "Before the first trial, there [were] *** no efforts by [her] to get ahold of him." She learned during the middle of the first trial that the State had decided not to subpoena Grady. Grady's girlfriend gave counsel Grady's number, and after the first trial, counsel attempted to call him twice without success. She "did not speak to him" but "did reach out." The rationale behind not trying to use the affidavit was that the State's case was

_____

[2]The witness's name was spelled as "Torrey" in the report of proceedings from trial and "Torrie" in the report of proceedings from the *Krankel* hearing.

based completely on circumstantial evidence, and the "argument was what was not brought to the table was more important than what was." Counsel did not attempt to subpoena Grady for the second trial because the argument in the first trial worked well. Specifically, McFall-Dorsey and Grady, whose car was damaged by gunshots, did not feel strongly enough about this case to come to court. "In hindsight, [counsel] would have liked a little bit more time to rework that theory because it was blocked at every single step of the way in the second trial" by the prosecutor. Counsel had only two months to prepare for the second trial, and she could not use the same strategy that she had used in the first trial.

¶ 24        Counsel stated that she did not call Torrey and Tyler because she did not have their information. Counsel did not personally have time to contact Torrey and Tyler because she was busy preparing for trial. Torrey and Tyler were not discussed before the second trial, but they were discussed before the first trial. Tyler would have testified that someone was on the ground in Dunkin' Donuts, which defendant wanted to use to undermine Perez's testimony. Torrey participated in a photo array and did not make a positive identification, which evidence counsel got in at trial through a detective.

¶ 25        We summarize the trial court's findings. Counsel had tried to contact Grady but was unable to reach him. Her theory of the case was that this was a circumstantial evidence case without a lot of witnesses who saw what happened. Counsel cross-examined Perez about inconsistencies in his testimony, attacked the DNA evidence, and inferred that Grady was not concerned enough to be at the trial. Both counsel and the State tried to get Grady to come in but no one could, and it was a trial decision whether to pursue him. The trial court could not think of a hearsay exception that would allow the affidavit into evidence. Counsel's decision not to pursue Grady was not neglect of the case.

¶ 26 Regarding Torrey and Tyler, the trial court stated that there were a number of witnesses, including defendant's girlfriend, who identified defendant as being at the scene of the shooting. He was also seen in the video wearing a medical boot. There was witness testimony that the man in the boot shot the gun and ran north through an alley, and a gun was found on a roof in the alley. There were some differences about the gun's color, but one witness said that it was pink, and a pink gun was found in the flight path. Counsel said that she was unable to reach the witnesses, which was a strategic decision, but even if they could have come in, the trial court did not think it would have changed the outcome, such that it was harmless error. In sum, both issues involved trial tactics, so it was denying defendant the appointment of new counsel to pursue a claim of ineffective assistance.

¶ 27 On appeal, defendant argues that counsel in her own words indicated that she was ineffective, as she had an affidavit from Grady stating that defendant was not the shooter and that shots were fired at both him and defendant. Defendant notes that counsel did not reach out to Grady before the first trial and only tried to call him twice before the second trial. Defendant asserts that counsel never indicated that she tried to subpoena him or what type of investigation she did to try to find him. According to defendant, there is no trial strategy in not attempting to interview or subpoena a victim who could exonerate a client.

¶ 28 Defendant further argues that although counsel claimed that she did not have the information for Torrey and Tyler and did not attempt to find them, the State's discovery listed their names, Torrey's employment information, and Tyler's home address. Defendant asserts that it is unknown if this information would have been helpful in finding them because counsel simply stated that she did not have their information and did not look into them as witnesses.

¶ 29    We conclude that the trial court's determination that defendant failed to show that his counsel neglected his case, and its corresponding denial of the request to appoint new counsel, were not manifestly erroneous. As defendant acknowledges in his brief, counsel would not have been able to introduce Grady's affidavit at trial due to hearsay limitations. Defendant argues that counsel did not make any attempt to contact Grady before the first trial, but the issue before us is counsel's performance at the second trial. Counsel stated that she obtained Grady's phone number from his girlfriend and attempted to contact him twice, but she was unable to reach him. Detective Phenicie testified that he never interviewed Grady because he was unable to locate him and was therefore also not able to serve him with a subpoena. He testified that Sergeant Griffet talked to Grady on about June 25, 2019. Sergeant Griffet testified that he was able to speak to Grady because of an unrelated matter, and Grady said that he did not want to make a statement in the case and that the police did not need him because the incident was recorded. Griffet described Grady's level of cooperation as "[v]ery poor."

¶ 30    Accordingly, it was unlikely that defense counsel would have been able to locate Grady and subpoena him, even if she had continued to pursue him. Further, counsel stated that because the State's case was based on circumstantial evidence, her strategy was arguing that "what was not brought to the table was more important than what was," including that Grady and McFall-Dorsey did not even feel strongly enough about the case to bother coming to court. Counsel also stated that she only had two weeks until the retrial. Given the circumstances, counsel's decision not to pursue Grady further can be viewed as trial strategy as opposed to neglect of the case, or as harmless error due to even the State's inability to locate him.

¶ 31    Counsel's decision not to pursue Torrey and Tyler can also be viewed as trial strategy, as they would have contributed little to the case. Detective Fisher testified that Torrey

identified a person in a photo lineup, and Detective Phenicie testified that Torrey did not identify defendant in the lineup. The prosecutor even stated in rebuttal closing argument that Torrey identified someone other than defendant in the photo lineup. Thus, Torrey's testimony to this effect would have been cumulative. Tyler's testimony that someone was on the ground near Dunkin' Donuts could be seen as contradicting Perez's testimony that he was in the car when the shooting took place, but it is undisputed that Perez and his wife were present in the parking lot and that one of them took a video of the argument prior to the shooting, so Tyler's testimony would not have undermined Perez's believability. Accordingly, counsel's failure to pursue Torrey and Tyler as witnesses can reasonably be viewed as either trial strategy or harmless error.

¶ 32                              B. Ineffective Assistance of Counsel

¶ 33          Defendant next argues that he was denied his constitutional right to the effective assistance of counsel. For such a claim, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption that trial counsel acted competently and that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *People v. Lewis*, 2022 IL 126705, ¶ 46. A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Gayden*, 2020 IL 123505, ¶ 27.

¶ 34          Defendant argues that counsel was ineffective because she did not issue subpoenas for any witnesses who were administered a photo lineup or for any officers who administered the

lineups. Defendant argues that counsel tried to overcome these deficiencies during trial by attempting to admit evidence by way of hearsay through detectives. Defendant asserts that due to her deficiencies, the jury was never informed that three people were shown photo lineups, two of those people could not identify anyone, and the third person identified someone other than defendant.

¶ 35       Defendant additionally argues that counsel was ineffective for not objecting to Griffet's hearsay testimony that Grady said that he did not want to participate in the case, that the incident was recorded, and that the detective could just watch the video and did not need him. Defendant asserts that this statement allowed the jury to hear that the video was an accurate depiction of what happened, thereby implying that the State's theory of what occurred off camera was also accurate. Defendant maintains that it is also unclear what video Grady was referring to, as there was no testimony that Grady was shown a video or confirmed that the video included the person who shot at him.

¶ 36       Defendant argues that without these deficiencies, the case's probable outcome would have been different because it was questionable whether there was another person in the parking lot that day, no one identified him as the shooter, and Torrey identified someone other than defendant as the shooter. Defendant points out that in the first trial, he was found not guilty of one count and had a mistrial on the remaining counts.

¶ 37       We conclude that defendant cannot satisfy either prong of the *Strickland* test. For the first prong of performance, defense counsel was able to introduce testimony that the police conducted photo lineups with three individuals and that none of them identified defendant, so testimony from the officers conducting the lineup and the witnesses doing the lineups would largely be cumulative. Counsel was also not deficient in not objecting to Griffet's testimony

regarding Grady, as the information corresponded to her trial strategy that Grady did not even care enough about the case to participate. The only reasonable assumption is that Grady watched the video of him and defendant fighting, which was shown to the jury. No one disputed that what occurred on the video was an accurate depiction of what happened before the shooting, nor does defendant make such an assertion now.

¶ 38     Even if, *arguendo*, counsel provided deficient representation, defendant's ineffective assistance of counsel claim fails because he cannot demonstrate prejudice. Having the witnesses who participated in the lineups and/or the officers conducting the lineups testify at trial would have been largely cumulative of Detective Phenicie's testimony that the police conducted three lineups and no one identified defendant. It is unlikely that defense counsel would have been able to locate Grady and get him to testify at trial even if she had spent more time pursuing him as a witness, as the State was unable to do so. It is also uncertain whether Grady would have testified consistently with the affidavit.

¶ 39     Furthermore, there was very strong evidence that defendant was the shooter. Defendant's girlfriend testified that he had gotten into a fight with Grady in the parking lot, and she identified him in a photo taken from the video, including that he was wearing a medical boot. Perez testified that the man with the medical boot was the person who shot at the man in the Trailblazer. Perring testified that a man wearing clothing that was consistent with defendant's used a handgun with a pink bottom to shoot at the driver's side of a parked SUV. Orr testified that after hearing gunshots, she saw a man running north on Neil Street. The police obtained information from a confidential witness, retraced the suspect's flight path, and found a pink handgun. The handgun was determined to have fired the bullets that hit the SUV. Defendant could not be excluded as a contributor on two DNA profiles found on the handgun, with 1 in 1300 people being

possible contributors to the first profile and 1 in 37,000 being possible contributors to the second profile.

¶ 40        Therefore, there is not a reasonable probability that the trial's result would have been different had the additional witnesses testified about the photo lineups or had counsel expended more effort to locate Grady.

¶ 41                              C. Closing Argument

¶ 42        Defendant next argues that the prosecutor misstated the testimony of the DNA expert during closing argument when stating:

> "Instead, we have two numbers, 1 in 13 hundred and 1 in about 37 thousand. 1 in 37 thousand. That might not sound like a lot. Population of Champaign, under 100 thousand, about 88 thousand.
>
>     So, what does that mean? In Champaign, there's less than three people that have that same profile. Champaign County, about 200 thousand. Four and a half people with that same profile. What are the chances?"

Defendant argues that the prosecutor's statement that the DNA could come from only 3 or 4.5 people in Champaign or Champaign County is a fallacy, as the numbers are based on 1 in 1300 and 1 in 37,000 people in the world. Defendant maintains that if you use 7,846,000,000 as the world's population, there are over 21,000[3] possible people who could all be in the United States or in any other locations in the world.

¶ 43        Defendant cites *People v. Lyles*, 106 Ill. 2d 373, 381 (1985), for the proposition that prosecutorial misconduct in closing argument warrants reversal of the conviction and a new trial

---

[3]We note that 7,846,000,000 divided by 37,000 is approximately 212,054.

if the improper remarks constitute a material factor in the conviction.[4] Defendant also cites *People v. Witted*, 79 Ill. App. 3d 156, 166-68 (1979), where the court stated that it could not "say that the prosecutor's comments did not contribute to the defendant's convictions," and it ordered a new trial.

¶ 44    We note that although defendant included the issue of improper remarks in his motion to reconsider, he did not object to the complained-of statements at trial. Therefore, he has forfeited the issue for review. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review on appeal, a defendant must both object at trial and raise the issue in a posttrial motion). A prompt objection at trial allows the trial court to immediately sustain the objection and instruct the jury to disregard the statements, which generally cures any error. See *People v. Slabaugh*, 323 Ill. App. 3d 723, 731 (2001). Defendant deprived the trial court the opportunity to cure any potential error at trial, and he may not now seek reversal based on the alleged error.

¶ 45    Even absent forfeiture, defendant's argument would not be successful. Prosecutors generally have wide latitude in the content of their closing arguments and may comment on the evidence and any fair and reasonable inference from the evidence, even if the inference reflects negatively on the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 82. Improper remarks constitute reversible error only if they result in substantial prejudice to the defendant, such that absent the remarks, the verdict would have been different. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 32. Our supreme court has applied both the *de novo* (*People v. Wheeler*, 226 Ill. 2d 92, 121 (2007))

---

[4]The court actually stated the inverse, that "[w]here it appears that improper remarks do not constitute a material factor in the conviction *** the verdict will not be disturbed." (Internal quotation marks omitted.) *Lyles*, 106 Ill. 2d at 391.

and abuse of discretion standard of review (*People v. Blue*, 189 Ill. 2d 99, 128 (2000)) for the trial court's rulings on closing argument. Our result would be the same under either standard.

¶ 46    The prosecutor's remarks were not improper because a prosecutor may respond to statements by defense counsel that invite a response. *People v. James*, 2021 IL App (1st) 180509, ¶ 39. On cross-examination, after Gershburg testified that the statistics referred to the world's population, defense counsel stated, "just to play a numbers game a little bit. [The] United States of America has roughly over 300,000,000 people in it. So, one out of every 1,300 of those 300,000,000 people could share these similar three STR locis [*sic*] in this 9A swab?" Gershburg responded in the affirmative. As defense counsel raised the issue of a subset of the world's population in discussing the statistics, it was not error for the State to also do so. See *People v. Williams*, 2022 IL 126918, ¶ 44 ("[A] prosecutor may comment on matters implicated by defense counsel."); *cf. People v. Thompson*, 2013 IL App (1st) 113105, ¶ 98 (prosecutor could comment on an issue brought up by the defense during cross-examination).

¶ 47    Moreover, even if the remarks about the statistical probability from the local population were erroneous, they did not result in substantial prejudice. After the State's brief remarks regarding DNA, defense counsel commented much more extensively on the DNA evidence, saying things such as, "I said 300 million people in the United States of America, 1 out of 13 hundred of them"; that there were 3 short tandem repeats out of 23 and Gershburg was "not confident in that at all"; that "[t]ens of thousands of people in this country have that similar sequence" and that the local town did not consist of just Champaign residents; and that there were three contributors to the second sequence that "really just could be anybody." Accordingly, the jury was given a different perspective on the DNA evidence. Before closing arguments, the trial court also instructed the jury that closing arguments were not evidence and that it should disregard

any argument not based on the evidence. See *Williams*, 2022 IL 126918, ¶ 154 (a trial court can cure erroneous statements made during argument by, among other things, instructing the jury that arguments are not evidence and should be disregarded if not supported by the evidence).

¶ 48       Furthermore, the DNA evidence was just one part of the State's evidence against defendant, which included a video of him fighting the victim just before the shooting and eyewitness testimony that the man wearing the medical boot, which defendant was wearing at the time, was the person who fired the shots. In sum, defendant has not demonstrated that absent the limited remarks, the verdict would have been different.

¶ 49                     D. Sufficiency of the Evidence

¶ 50       Last, defendant argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm, as there was no evidence that defendant knowingly shot the gun in the direction of another person. Defendant notes that Perring testified that she did not know if anyone was in the SUV. He recognizes that Perez testified that one person got into the SUV and the other person got a gun and started shooting, but he argues that although Perez also testified that he stopped recording when he heard gunshots, the video does not show people going to their vehicles or the shooting.

¶ 51       When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The same standard of review applies whether the evidence is direct or circumstantial. *People v. Brown*, 2013 IL 114196, ¶ 48. The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the

evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 52 As charged, the State was required to prove that defendant discharged a firearm in the direction of another person or in the direction of a vehicle that he knew or reasonably should have known was occupied by a person. 720 ILCS 5/24-1.2(a)(2) (West 2018). Perez testified that he saw one of the individuals from the fight get into a Trailblazer and the other individual from the fight (which other evidence indicated was defendant) go to another vehicle, get a gun, and "start shooting the SUV driver." Though the video did not show the men going to their respective vehicles or the actual shooting, it did not contradict Perez's version of the shooting's details. "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36. Perez had a clear view of what was occurring based on the vantage point shown in the video and no motive to provide false testimony, and the jury could have reasonably accepted his testimony that someone was in the SUV that was being shot at.

¶ 53                                      III. CONCLUSION

¶ 54 For the reasons stated, we affirm the judgment of the Champaign County circuit court.

¶ 55 Affirmed.